49 F.3d 75
 67 Fair Empl.Prac.Cas. (BNA) 264,
66 Empl. Prac. Dec. P 43,505, 63 USLW 2552
 Warren JOHNSON, Plaintiff-Appellant,
v.
STATE OF NEW YORK, Mario Cuomo, in his official capacity as
Governor of the State of New York, New York State Division
of Military and Naval Affairs and Lawrence P. Flynn, in his
official capacity as Major General of the New York State
Division of Military and Naval Affairs, Defendants-Appellees.
 No. 580, Docket 94-7408.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 23, 1994.
Decided Feb. 24, 1995.
 
 William A. Herbert, Albany, NY (Nancy E. Hoffman, General Counsel, Civil Service Employees Ass'n, Inc., Albany, NY), for plaintiff-appellant.
 John McConnell, Asst. Atty. Gen., State of New York (G. Oliver Koppell, Atty. Gen. of the State of New York, Peter H. Schiff, Deputy Sol. Gen., Nancy A. Spiegel, Asst. Atty. Gen., of counsel), for defendants-appellees.
 Before: JACOBS, CALABRESI and PARKER, Circuit Judges.
 PARKER, Circuit Judge:
 
 
 1
 Appellant Warren Johnson was employed as a security guard by the New York State Division of Military and Naval Affairs (Division) at the Stratton Air National Guard Base in Scotia, New York, from March 1983 until his dismissal upon his 60th birthday on January 8, 1991. During his employment with the Division, he was also an enlisted member of the New York Air National Guard (ANG), a mandatory condition of employment for civilian air base security guards under Division regulations. Johnson retired from the ANG at age 60 as required by federal military regulations, resulting in his discharge from his civilian Division job.
 
 
 2
 We hold that Johnson has established a violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. Sec. 621 et seq.
 
 BACKGROUND
 
 3
 In 1976, the Division created the civilian position of air base security guard, imposing "dual status"--that is, concurrent active membership in the ANG--as a condition of employment for the job. Under Division regulations, any civilian employed by the Division in a job requiring dual status is subject to summary termination in the event the employee loses his or her ANG membership, no matter what the reason. State of New York Division of Military and Naval Affairs, Military Regulation No. 7 (MR-7) Sec. 6-2(h)(1)(f) (1981). Another section of MR-7, Sec. 8-3(a), refers explicitly to age as follows:
 
 
 4
 Retirement of [civilian] employees is mandatory at age seventy (70), with the exception of personnel occupying Officer Grade positions which ordinarily require membership in the Organized Militia and a concurrent reserve of the Army, Air Force or Navy status, who must retire at age sixty (60).
 
 
 5
 With limited exceptions not applicable to this case, ANG members are required by federal military regulations to separate from the ANG at age 60. Department of the Air Force, Air National Guard Regulation 39-10, Para. 3-17 (1987).
 
 
 6
 The dual status policy was modified by an agreement in 1988 between the Division and the security guards' union, the Civil Service Employees Association. The 1988 agreement provides that an employee who has lost membership in the ANG under honorable circumstances may nevertheless retain civilian employment as a security guard if the employee had ten years of continuous and concurrent service in both the ANG and the civilian post immediately prior to dismissal from the ANG. Johnson, though a long-time member of the ANG, had been employed as a base security guard for less than 8 years at the time of his retirement from the ANG, and therefore did not qualify for the modification to MR-7 contained in the 1988 agreement.
 
 
 7
 By letter dated December 20, 1990, the Division's Human Resources Director informed Johnson that he would be terminated from his civilian position on January 8, 1991. The letter stated:
 
 
 8
 This termination is a result of your loss of Air National Guard membership associated with you reaching your 60th birthday and is no reflection on your almost seven [sic] years of dedicated service to this agency.
 
 
 9
 Johnson brought suit against the appellees (collectively, the State) in May 1992, primarily alleging that his dismissal violated the ADEA. He also alleged that he was terminated from public employment without due process of law and that his dismissal violated two state laws, New York Executive Law Sec. 296 and New York Civil Service Law Sec. 72. The parties filed cross-motions for summary judgment. On March 30, 1994, the district court denied Johnson's motion, granted the State's motion, and dismissed the action.
 
 
 10
 The district court first analyzed Johnson's ADEA claim by applying the burden-shifting test of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), a decision under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e et seq., which also supplies the analytical framework in appropriate ADEA cases. See Taggart v. Time Inc., 924 F.2d 43, 46 (2d Cir.1991). Assuming that Johnson had established a prima facie case of age discrimination, the district court determined that the State met its burden of producing evidence of a legitimate, nondiscriminatory reason for its action--namely, that Johnson was discharged because he could no longer maintain the requisite dual status. Dual status, in turn, was held justified by three age-neutral reasons: (1) the policy assures that security guards are fully trained in accordance with current standards of federal military practice; (2) it assures that guards are familiar with military protocol and the equipment they are assigned to protect; and (3) it assures that guards are available to accompany their unit in the event the unit is activated.
 
 
 11
 Having thus found that the State met its production burden, the district court next determined that Johnson failed to meet his burden to prove that the State's rationale was a pretext for discrimination. Indeed, it found that Johnson failed even to adduce evidence of pretext or discriminatory motive, and therefore concluded that the State was entitled to summary judgment on the ADEA claim. The court further concluded that Johnson could not establish a violation of the ADEA using either the "mixed motive" test, see Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), or disparate impact analysis. See Hazen Paper Co. v. Biggins, --- U.S. ----, ----, 113 S.Ct. 1701, 1706, 123 L.Ed.2d 338 (1993) (Supreme Court has not decided whether disparate impact theory of liability is available under ADEA).
 
 
 12
 The district court also granted summary judgment for the State on Johnson's claim alleging age discrimination under New York Executive Law Sec. 296, on the ground that its elements are coincident with the ADEA. The court further dismissed the federal due process claim on the ground that Johnson had no legitimate expectation of continued employment after his retirement from the ANG, and declined to reach the merits of the state Civil Service Law claim in light of the court's disposition of the ADEA claim.
 
 DISCUSSION
 
 13
 The ADEA makes it "unlawful for an employer ... to discharge any individual ... because of such individual's age." 29 U.S.C. Sec. 623(a)(1). The term "employer" includes states and state agencies. 29 U.S.C. Sec. 630(b). As under Title VII of the Civil Rights Act, liability in a disparate treatment ADEA case "depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision." Hazen Paper, --- U.S. at ----, 113 S.Ct. at 1706. The claim "cannot succeed unless the employee's protected trait actually played a role in [the employer's decisionmaking] process and had a determinative influence on the outcome." Id. Where an employment practice is facially discriminatory, the plaintiff need not prove the employer's animus or ill will toward older people. E.E.O.C. v. Borden's, Inc., 724 F.2d 1390, 1393 (9th Cir.1984), overruled on other grounds, Public Employees Retirement System of Ohio v. Betts, 492 U.S. 158, 173, 109 S.Ct. 2854, 2864, 106 L.Ed.2d 134 (1989).[1]
 
 
 14
 There is no question that the ANG itself intentionally discriminates on the basis of age. That conduct, however, is beyond the reach of the ADEA. See Frey v. State of California, 982 F.2d 399, 404 (9th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 3000, 125 L.Ed.2d 693 (1993) (National Guard not subject to provisions of ADEA). The question presented here, rather, is whether, by adopting the ANG's mandatory age-60 retirement policy as a term of employment for certain civilian air base guards (those unaffected by the 1988 union agreement), and firing Johnson when he turned 60 as a result, the State of New York discriminated on the basis of age in violation of the ADEA. Having reviewed the summary judgment record de novo, see Taggart v. Time Inc., 924 F.2d at 45-46, we conclude that it did.
 
 
 15
 At the outset, it should be noted that there is no factual dispute about why Johnson was fired. The parties agree that Johnson was required by his employer to have dual status, that Johnson lost his membership in the ANG when and because he reached the age of 60, and that under MR-7 he thereby lost his civilian job. The State has offered no other reason for its termination of Johnson. Johnson was fired, in short, because the State incorporated the military's mandatory retirement age into the terms of employment governing civilian air base security guards.
 
 
 16
 The McDonnell Douglas framework, which guided the district court's analysis, is intended to assist the fact-finding process when the plaintiff is unable to present direct evidence of discrimination. Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1985). As the Supreme Court recently stated:
 
 
 17
 With the goal of "progressively ... sharpen[ing] the inquiry into the elusive factual question of intentional discrimination," Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 255, n. 8, [101 S.Ct. 1089, 1094, n. 8, 67 L.Ed.2d 207] (1981), our opinion in McDonnell Douglas Corp. v. Green established an allocation of the burden of production and an order for the presentation of proof in Title VII discriminatory-treatment cases.
 
 
 18
 St. Mary's Honor Center v. Hicks, --- U.S. ----, ----, 113 S.Ct. 2742, 2746, 125 L.Ed.2d 407 (1993) (citations omitted). In cases such as this, where there is direct evidence that the disparate treatment (here, discharge) is age-dependent, the McDonnell Douglas search for a motive is unnecessary and therefore inapplicable. Trans World Airlines, Inc. v. Thurston, 469 U.S. at 121, 105 S.Ct. at 621. There being no factual dispute, the question presented here is purely legal: given the undisputed facts, did the State's treatment of Johnson violate the ADEA?
 
 
 19
 Our holding that it did is compelled by Arizona Governing Committee for Tax Deferred Annuity and Deferred Compensation Plans v. Norris, 463 U.S. 1073, 103 S.Ct. 3492, 77 L.Ed.2d 1236 (1983). In Norris, the Supreme Court held that the State of Arizona's retirement plan for its employees discriminated on the basis of sex in violation of Title VII, where employees had the option of receiving benefits from one of several companies selected by the state, all of which paid lower monthly retirement benefits to a woman than to a man who made the same contributions. The companies selected by the employer facially discriminated against women (by using sex-based mortality tables); the Court held the employer responsible for this discrimination:
 
 
 20
 Having created a plan whereby employees can obtain the advantages of using deferred compensation to purchase an annuity only if they invest in one of the companies specifically selected by the State, the State cannot disclaim responsibility for the discriminatory features of the insurers' options. Since employers are ultimately responsible for the "compensation, terms, conditions, [and] privileges of employment" provided to employees, an employer that adopts a fringe-benefit scheme that discriminates among its employees on the basis of race, religion, sex, or national origin violates Title VII regardless of whether third parties are also involved in the discrimination.
 
 
 21
 Id. at 1089, 103 S.Ct. at 3502 (footnotes omitted).
 
 
 22
 Similarly, in the present case the ANG has a termination policy that facially discriminates on the basis of age. That policy does not itself violate the ADEA, just as the private annuity companies in Norris did not themselves violate Title VII. But the State of New York--an employer covered by the ADEA--is not permitted to adopt the ANG's facially discriminatory termination policy as a condition of employment for its civilian employees, as Arizona could not adopt a fringe-benefit scheme that facially discriminated among its employees on the basis of sex, "regardless of whether third parties are also involved in the discrimination."
 
 
 23
 The State, however, insists that its dismissal of Johnson was motivated, not by age, but by the legitimate reasons underlying the dual status requirement. The State relies upon Hazen Paper. Hazen Paper involved an employee who was fired when he was 62 years old in order to prevent his pension from vesting. The employer's pension plan had a 10-year vesting period; the employee was just shy of the 10-year mark when he was fired. --- U.S. at ----, 113 S.Ct. at 1704. Although the employer's conduct was actionable under the Employee Retirement Income Security Act of 1974, it did not, without more, violate the ADEA. "[T]here is no disparate treatment under the ADEA when the factor motivating the employer is some feature other than the employee's age." Id. at ----, 113 S.Ct. at 1705.
 
 
 24
 When the employer's decision is wholly motivated by factors other than age, the problem of inaccurate and stigmatizing stereotypes disappears. This is true even if the motivating factor is correlated with age, as pension status typically is.
 
 
 25
 Id. at ----, 113 S.Ct. at 1706 (emphasis in original).
 
 
 26
 The State's reliance on Hazen Paper is unavailing. The flaw in the State's argument is that the decision to require dual status, with consequent mandatory retirement at 60 (except as provided in the 1988 agreement), is not merely correlated with age; unlike Hazen Paper, the employer's decision here in fact implements an age-based criterion. Regardless of the State's reasons for requiring that certain of its civilian employees maintain ANG membership, there can be no doubt that Johnson's age "actually played a role ... and had a determinative influence" on the decision to terminate his employment. Id.; cf. International Union, United Automobile, Aerospace & Agricultural Implement Workers of America v. Johnson Controls, Inc., 499 U.S. 187, 199, 111 S.Ct. 1196, 1203, 113 L.Ed.2d 158 (1991) (company's fetal-protection policy explicitly discriminated on the basis of sex; "the absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect"). In this case, age and termination are inextricably linked. The sole reason for Johnson's loss of dual status and his consequent termination was age.
 
 The dissent correctly states:
 
 27
 Employers frequently seek to hire people who have and can maintain a status conferred by some other agency (certified teachers, off-duty police, licensed pilots), where that status serves as an imprimatur of training, character, or necessary physical or mental condition. The ADEA does not outlaw such considerations.
 
 
 28
 However, where as here the employee's ability to maintain the required status is conditioned on age, the requirement is outlawed by the ADEA unless the status is a bona fide occupational qualification. We have not considered the latter possibility because the State has explicitly disavowed reliance on the BFOQ defense in this case.
 
 
 29
 Accordingly, we hold on these facts that Johnson's termination from employment at age 60 was in violation of the ADEA as a matter of law. There being no material facts in dispute, Johnson is entitled to summary judgment on the ADEA claim. Fed.R.Civ.P. 56(c). Johnson's remedy for the ADEA violation, however, is a matter properly left for the district court's consideration on remand.
 
 
 30
 Because the district court's disposition of Johnson's state law claims was dependent on its ADEA judgment, Johnson is permitted to seek reconsideration of those claims on remand in light of our decision. As to Johnson's constitutional due process claim, we hold that Johnson has not established that he was entitled to any more process than was in fact provided. Where an employer is required by law to terminate an employee, a pretermination hearing is not mandated by the Constitution. See Cleveland Board of Education v. Loudermill, 470 U.S. 532, 543 n. 8, 105 S.Ct. 1487, 1494 n. 8, 84 L.Ed.2d 494 (1985). We accordingly affirm the district court's dismissal of Johnson's due process claim.
 
 CONCLUSION
 
 31
 The judgment is reversed. As there are no material facts in dispute and Johnson is entitled to judgment as a matter of law, the district court on remand is directed to grant Johnson's motion for summary judgment on the ADEA claim and to hold such further proceedings as necessary to consider Johnson's state law claims and to impose an appropriate remedy.
 
 JACOBS, Circuit Judge, dissenting:
 
 32
 I respectfully dissent. The majority frames the issue as "whether, by adopting the Air National Guard's (the "Guard") mandatory age-60 retirement policy as a term of employment," the Division violated the ADEA. Having framed the issue in that way, the majority has little trouble concluding that the Division's policy is facially discriminatory. I do not see the issue in terms of an adoption by reference of the Guard's retirement policy. Nor do I think that the Division's termination policy is "inextricably linked" to age. I would therefore consider the Division's policy within the McDonnell Douglas framework. So considered, the Division's policy handily withstands challenge under the ADEA, as United States Magistrate Judge Ralph Smith concluded in his admirable, unpublished opinion.
 
 
 33
 The majority opinion sets forth the section of the Division's military regulations that fixes a retirement age of 60. State of New York Div. of Military and Naval Affairs, Military Reg. No. 7 (MR-7), Sec. 8-3(a) (1981). At oral argument, however, the Division asserted--and Johnson's counsel did not dispute--that this was a case of termination, not retirement, and that the retirement section of its regulations therefore was not invoked in terminating Johnson. Instead, Johnson was terminated pursuant to another section of MR-7, which provides that, if an "employee, occupying a position which required active status as a member of the Organized Militia, i.e., Air Base Security Guard positions, loses such status, under any circumstances," he may be terminated. State of New York Division of Military and Naval Affairs, Military Regulation No. 7 Sec. 6-2(h)(1)(f) (emphasis added). This is the only regulation implicated in this case, and it is facially neutral, as neutral as the policy it serves and implements: that civilian security guards posted at the Stratton Air National Guard Base maintain active status in the Guard.
 
 
 34
 The ADEA is concerned with the role that age plays in the employer's decision to terminate. See Hazen Paper Co. v. Biggins, --- U.S. ----, ----, 113 S.Ct. 1701, 1706, 123 L.Ed.2d 338 (1993) ("a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome"). The majority concludes that "Johnson was fired, in short, because the State incorporated the military's mandatory retirement age into the terms of employment...." I conclude that Johnson was fired because--and only because--he no longer was an active member of the Guard. The reason he lost that status is immaterial, since it played no part in the actual decision to terminate his employment.
 
 
 35
 The majority opinion concludes that the Division's policy is facially discriminatory because "[a]ge and termination are inextricably linked," and draws an analogy to the facial discrimination in Arizona Governing Committee for Tax Deferred Annuity and Deferred Compensation Plans v. Norris, 463 U.S. 1073, 103 S.Ct. 3492, 77 L.Ed.2d 1236 (1983). There is no doubt that Johnson was terminated in accordance with a regulation whose effect will often correlate with age, and that the Division's policy invites scrutiny under the ADEA. However, the correlation is not one-to-one and is not of the Norris variety. In Norris, the State offered annuity benefits through insurance companies that relied on actuarial tables to pay lower benefits to all women. Thus an entire protected class of employees suffered discrimination in job benefits; it was held that the State could not defend on the ground that the differential was the doing of the insurers. In this case, the Division's policy operates in a neutral way: not everyone who attains age 60 is terminated; not everyone who is terminated has attained age 60. Any employee who loses active Guard status is subject to termination, regardless of age, race or sex, and regardless of the reason for separation from the military. The only distinction that kicks in at age 60 is that an employee who ceases to be a member of the militia solely by virtue of turning 60 is eligible for a waiver, providing for retention of individuals who have at least ten years continuous service in the Guard and the Division. Such a policy, which merely correlates with age, is subject to analysis within the burden-shifting framework of McDonnell Douglas.
 
 
 36
 The opinion of magistrate judge Smith does what McDonnell Douglas requires, and thereby demonstrates the non-discriminatory purpose and effect of the Division's policy and Johnson's termination. If that opinion were published, I would say little more. Since it is unpublished, I will set forth the key points of the analysis. The first step is to determine whether the plaintiff has presented a prima facie case of discrimination. See Stetson v. NYNEX Serv. Co., 995 F.2d 355, 359 (2d Cir.1993). Although that is disputable, the Division has not disputed it, and the burden therefore shifts to the defendant "to rebut the presumption of discrimination by producing evidence that the plaintiff was [terminated] ... for a legitimate, nondiscriminatory reason." Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). The Division offered the following reasons for the "dual status" requirement, as summarized by the magistrate judge. First, "the training requirements for that position can be met through participation in National Guard training." Johnson v. State of New York, Dkt. No. 92-CV-643, Slip Op. at 8-9 (March 24, 1994). Second, "Air Base Security Guards are armed with sidearms and work inside military air bases providing security for aircraft and related equipment. Thus, specialized training is required which is facilitated by their Guard membership." Id. at 9. The magistrate judge referenced two letters in the record that supported this argument that training was the primary reason for the dual-status requirement. Finally, the dual-status requirement assures "that Air Base Security Guards are uniformed personnel, who are familiar with military protocol and terminology and with the equipment they are to protect ... [and] that in the event their unit is activated, the Air Base Security Guards are available to accompany their unit and the aircraft they are responsible for protecting." Id. at 10 (citing Ridgway v. Aldrige, 709 F.Supp. 265, 270 (D.Mass.1989)).
 
 
 37
 In my view, this more than satisfies the Division's burden under the second prong of the McDonnell Douglas analysis. These non-discriminatory considerations have a direct and plausible bearing on the training and function of the employees, as well as on the costs of assuring readiness. Air base security guards serve under the general management of an Air National Guard security officer, and perform such duties as armed patrols, security protection of facilities under applicable directives of the Department of Defense, the Air Force, and the Air National Guard, as well as various armed response functions. In addition, these security guards inspect weapons and ammunition vaults, and perform the security measures necessary to secure the combat potential of their Guard units against sabotage and attack. There is, therefore, a close kinship in function and duties between air base security guards and national guardsmen. The quasi-military nature of these security guards ought to engender a high level of deference from a court. "[I]t is difficult to conceive of an area of governmental activity in which the courts have less competence. The complex subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject always to civilian control of the Legislative and Executive branches. The ultimate responsibility for these decisions is appropriately vested in branches of the government which are periodically subject to electoral accountability." Gilligan v. Morgan, 413 U.S. 1, 10, 93 S.Ct. 2440, 2446, 37 L.Ed.2d 407 (1973).
 
 
 38
 Having correctly concluded that the Division adequately rebutted the presumption of discrimination, the magistrate judge considered the final factor: whether the plaintiff had met his ultimate burden of persuasion, by proving both that the reasons given by the division were a "pretext" and that he was the victim of intentional discrimination. See id. --- U.S. at ---- - ----, 113 S.Ct. at 2747-48. Magistrate Judge Smith concluded:
 
 
 39
 [D]efendants correctly contend that while plaintiff's arguments may very well raise questions as to whether the dual status requirement is the best means of assuring that Air Base Security Guards are properly trained, he has failed to demonstrate that the primary purpose of the policy--facilitation of training--is pretextual. More fundamentally, he has failed to adduce any evidence that the dual status requirement was in fact adopted by [the Division] in an effort to discriminate against older employees. The Supreme Court has noted that in its view, " 'pretext' means 'pretext for discrimination.' " St. Mary's, --- U.S. at ----, 113 S.Ct. at 2752.
 
 
 40
 Slip Op. at 15.
 
 
 41
 The magistrate judge then moved on to consider whether Johnson had provided any evidence that "the true motivation for the policy is discriminatory animus against older employees on the basis of age." Id. The ten-year service waiver provision, adopted as part of the collective bargaining agreement, refutes the idea that the dual-service provision was a retirement provision in disguise. Theodore D. Chrimes III, the man who negotiated the 10-year service waiver provision on behalf of the Division, testified at deposition that the dual-status requirement was not " 'intended nor does it have any relationship to retirement.' " Id. Donald J. Kelly, who signed the agreement for this provision on behalf of the employees' union, admitted in an affidavit that " '[t]here was absolutely no discussion regarding a [Division] employee's being honorably discharged because of age or that [the Division] was adopting the military's mandatory retirement age.' " Id. at 16.
 
 
 42
 After rejecting various arguments put forward by Johnson, the magistrate judge concluded that "plaintiff's termination was based on a factor that was only empirically related to age." He pointed out that, under the 1988 collective bargaining agreement (creating the waiver of dual-status for employees with at least 10 years of service), Air Base Security Guards who reach 60 years of age could continue in their posts while, "if a 28-year old Air Base Security Guard were to resign from the Guard after just four years of service, or even after almost eight years like plaintiff, the dual status policy would mandate the loss of his State job." The magistrate judge properly concluded that Johnson failed to demonstrate either pretext or discriminatory intent. For this reason, he held that the Division would be granted summary judgment.
 
 
 43
 The McDonnell Douglas analysis illuminates a root distinction between Norris and Johnson's claim here. In Norris, the challenged practice had nothing to do with job performance or qualification. Here, the challenged practice serves the employer's mission directly and significantly. Employers frequently seek to hire people who have and can maintain a status conferred by some other agency (certified teachers, off-duty police, licensed pilots), where that status serves as an imprimatur of training, character, or necessary physical or mental condition. The ADEA does not outlaw such considerations. The job-related character of the dual-status requirement can be demonstrated by considering the effect of abandoning it. Over time, an increasing proportion of the civilian security detail at that base would consist of people who are not active members of the Guard. If the Guard is then activated for foreign, war-time duty, few civilian security guards may be available to accompany the unit to its destination. Officials responsible for the air base may start to wonder whether the security mission can be accomplished by civilian employees.
 
 
 
 [1]
 The ADEA (like Title VII) contains an exception to liability "where age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business." 29 U.S.C. Sec. 623(f)(1) (commonly known as the BFOQ defense). See Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 122, 105 S.Ct. 613, 622, 83 L.Ed.2d 523 (1985). The State does not here contend that age is a BFOQ for the position of air base security guard and has, in fact, specifically waived that defense in the proceedings below