220 F.3d 193 (3rd Cir. 2000)
 ERIE COUNTY RETIREES ASSOCIATION and LYMAN H. COHEN, for himself and all others similarly situated
v.
THE COUNTY OF ERIE, PENNSYLVANIA and ERIE COUNTY EMPLOYEES' RETIREMENT BOARD
Erie County Retirees Association and Lyman H. Cohen, as representative and on behalf of the class, Appellants (D.C. Civ. No. 98-272)
 No. 99-3877
 UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT
 Argued May 11, 2000
Filed August 1, 2000
 
 On Appeal from the United States District Court for the Western District of Pennsylvania District Judge: Honorable Sean J. McLaughlin[Copyrighted Material Omitted]
 Attorneys for Appellants: Daniel J. Pastore (argued) The McDonald Group, L.L.P. 456 West 6th Street P.O. Box 1757 Erie, PA 16507-0757
 Attorneys for Appellee The County of Erie, Pennsylvania: Richard A. Lanzillo (argued) Jennifer E. Gornall Knox McLaughlin Gornall & Sennett, P.C. 120 West Tenth Street Erie, PA 16501
 Attorneys for Amicus Curiae Equal Employment Opportunity Commission: C. Gregory Stewart General Counsel Philip B. Sklover Associate General Counsel Lorraine C. Davis Assistant General Counsel Robert J. Gregory (argued) Senior Attorney Equal Employment Opportunity Commission 1801 L Street, N.W. Washington, D.C. 20507
 BEFORE: GREENBERG and MCKEE, Circuit Judges, and SHADUR,* District Judge
 OPINION FOR THE COURT
 GREENBERG, Circuit Judge.
 
 I. INTRODUCTION
 
 1
 This matter comes on before this court on appeal from an order of the district court entered September 30, 1999, granting partial summary judgment in favor of the County of Erie, Pennsylvania (the "County"), dismissing appellants' claim under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. S 621 et seq. See Erie County Retirees Ass'n v. County of Erie, 91 F. Supp.2d 860 (W.D. Pa. 1999) ("Erie County"). We are called upon to address the applicability of the ADEA when an employer offers its Medicare-eligible retirees health insurance coverage allegedly inferior to the coverage offered to retired employees not eligible for Medicare. The district court held that the ADEA did not apply in such circumstances. For the reasons set forth herein, we disagree, and accordingly will reverse and remand the case for further proceedings.
 
 A. Factual Background
 
 2
 In 1972, the County implemented a policy pursuant to which it provided its retired employees with health and hospitalization insurance benefits during their retirement. In 1987, the County began utilizing Blue Cross/Blue Shield of Western Pennsylvania, now known as Highmark Blue Cross/Blue Shield ("Highmark"), to provide the coverage. The County classified employees and retirees into three main coverage groups: one for current employees, one for Medicare-eligible retirees, and one for retirees not eligible for Medicare. Each group had separate but similar traditional indemnity coverage. Erie County, 91 F. Supp.2d at 861-62; App. at 10.
 
 
 3
 Faced with increasing health insurance costs, the Erie County Employees' Retirement Board (the "Board"), which administered the medical coverage, decided that employees hired after January 23, 1992, would not be eligible for continued health insurance benefits upon retirement. On December 12, 1995, the Board further restricted eligibility by declaring that persons the County hired prior to January 23, 1992, would remain eligible only if they fell into one of four groups: employees unable to continue their employment due to a disability and who otherwise were eligible for a disability retirement pension; employees who retired from the County government with at least 20 years of service and 55 years of age; employees involuntarily terminated from County government employment with at least eight years of service; and employees who retired from the County with at least eight years of service and 60 years of age. The plaintiff class in this action is composed of retirees who are aged 65 or older--and thus eligible for Medicare--who remain eligible for retiree health coverage under these restrictions. Erie County, 91 F. Supp.2d at 862-63; App. at 10.
 
 
 4
 In 1997, a change in government accounting standards prevented the County from continuing to use the "excess interest" generated by its pension funds to pay the premiums for retiree health coverage; instead, the County began to pay the premiums from its regular budget. That year, the County took over the Board's responsibility to select retiree health plans. In November 1997, pressure to reduce costs was enhanced when Highmark announced that it would increase the County's premiums for medical insurance coverage by an average of 48%. Erie County, 91 F. Supp.2d at 862-63.
 
 
 5
 In the fall of 1997, the County selected a plan called "SecurityBlue" for Medicare eligible retirees.[1] Effective February 1, 1998, the County required all former County employees qualified for SecurityBlue to accept that program or lose all health coverage. The district court described SecurityBlue as follows:
 
 
 6
 SecurityBlue is a coordinated health care plan provided through Keystone Health Plan West, Inc., a federally qualified health maintenance organization ("HMO"), and a contract with Medicare. SecurityBlue is available to persons who have Medicare Part B Medical Insurance and who live in the SecurityBlue `service area' [which includes most of western Pennsylvania]. This Plan differs from a traditional indemnity plan primarily in that the health care needs of each member are coordinated by his or her primary care physician ("PCP"), who is selected from a list of physicians provided in the SecurityBlue Provider directory. The PCP is responsible not only for administering care, but also for making referrals to specialists and arranging for hospitalization. Some degree of individual choice is lost under this Plan inasmuch as a member's PCP must be selected from a list of physicians within the SecurityBlue network and coverage is available only for services provided or authorized by the insured's PCP. In most cases, the SecurityBlue Plan does not pay for services that are not authorized by the insured's PCP [with the exception of emergencies]. The trade-off for this loss of choice is that, unlike the traditional indemnity plan, the SecurityBlue Plan has no deductibles and little or no co-payment obligation; generally, 100 percent of the covered services are paid for. In addition, SecurityBlue covers pre-existing conditions without a waiting period and also provides benefits for some services--such as eye examinations, dental visits and hearing aids--that are not available under traditional indemnity plans or Highmark's SelectBlue point-of-service plan . . . . However, SecurityBlue members must continue to pay Medicare Part B Medical Insurance premiums.
 
 
 7
 Erie County, 91 F. Supp.2d at 863 (footnotes omitted).
 
 
 8
 The County selected a Highmark plan, "SelectBlue," for its former employees not Medicare-eligible and therefore not eligible for SecurityBlue. It placed those former employees in SelectBlue effective October 1, 1998. The district court described SelectBlue as follows:
 
 
 9
 The SelectBlue Plan differs from SecurityBlue in that it is a hybrid `point-of-service' plan which combines the features of an HMO with those of a traditional indemnity plan. Under SelectBlue an insured can, for any health care incident, select either the HMO option (and accept its benefits and limitations) or the traditional indemnity option. In order to be eligible for SelectBlue, a retiree must be non-eligible for Medicare and must live in the SelectBlue service area [western Pennsylvania].
 
 
 10
 Erie County, 91 F. Supp.2d at 863.
 
 
 11
 Retirees who did not qualify for either SecurityBlue or SelectBlue because they did not reside within the western Pennsylvania service area were offered traditional indemnity health insurance.
 
 
 12
 Appellants contend that SecurityBlue provides inferior coverage as compared to SelectBlue and the traditional indemnity coverage previously available to them, but they largely focus their argument on the comparison between themselves and SelectBlue retirees. The gravamen of this lawsuit is that the County violated the ADEA by discriminatorily placing members of the plaintiff class into SecurityBlue on the basis of their having attained age 65.
 
 B. Procedural History
 
 13
 The Erie County Retirees Association and Lyman H. Cohen, on behalf of himself and all other similarly situated retirees of the County age 65 or over placed in SecurityBlue, filed this action on September 18, 1998, against the County and the Board. Count I of the complaint alleged that the County violated the ADEA by treating members of the plaintiff class less favorably on account of their age, as compared to (1) active employees and (2) retirees under age 65. As the district court pointed out, the claim of unequal treatment as between members of the plaintiff class and retirees under age 65 encompassed two time periods: (a) February 1, 1998, to October 1, 1998, during which the County required members of the plaintiff class to accept SecurityBlue coverage while retirees under age 65 remained covered under the traditional indemnity insurance plan, and (b) October 1, 1998, forward, during which members of the plaintiff class remained in SecurityBlue while retirees under age 65 were placed in SelectBlue. Erie County, 91 F. Supp.2d at 863-64. Count II of the complaint alleged state law claims for breach of contract, equitable estoppel, and breach of fiduciary duty against the County and the Board. The complaint alleged that the defendants represented that an employee who retired after eight years with the County would be entitled to health care coverage "on the same terms that that person had received health care coverage from the County while employed." App. at 10. On February 10, 1999, the court certified the action as an opt-in class action. App. at 4, 13-18.
 
 
 14
 Appellants and the County then filed cross-motions for partial summary judgment on Count I. Appellants did not seek summary judgment with respect to the claim that they were treated less favorably than active employees, but only as to the claim that they were treated less favorably than retirees under age 65.[2] Erie County, 91 F. Supp.2d at 865. Appellants argued that the County violated section 4(a) of the ADEA, 29 U.S.C. S 623(a), by adopting a facially discriminatory health insurance program. Erie County, 91 F. Supp.2d at 864. Section 4(a) provides in pertinent part:
 
 
 15
 It shall be unlawful for an employer--
 
 
 16
 (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age; [or]
 
 
 17
 (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age.
 
 
 18
 Appellants further argued that the only affirmative defense, or "safe harbor," which might justify the County's discriminatory policy is that set forth in section 4(f)(2)(B)(i) of the ADEA, 29 U.S.C. S 623(f)(2)(B)(i), which provides:
 
 
 19
 It shall not be unlawful for an employer . . .--
 
 
 20
 . . . .
 
 
 21
 (2) to take any action otherwise prohibited under subsection (a) . . . of this section--
 
 
 22
 . . . .
 
 
 23
 (B) to observe the terms of a bona fide employee benefit plan
 
 
 24
 (i) where, for each benefit or benefit package, the actual amount of payment made or cost incurred on behalf of an older worker is no less than that made or incurred on behalf of a younger worker, as permissible under section 1625.10, title 29, Code of Federal Regulations (as in effect on June 22, 1989).
 
 
 25
 The referenced regulation, 29 C.F.R. S 1625.10 (1989), established an "equal benefit or equal cost" standard under which an employer either must provide equal benefits to older and younger workers, or must incur the same costs on behalf of older and younger workers. See Auerbach v. Board of Educ. of the Harborfields Cent. Sch. Dist. of Greenlawn, 136 F.3d 104, 111-12 (2d Cir. 1998); EEOC v. Massachusetts, 77 F.3d 572, 573-74 (1st Cir. 1996). The regulation provides in pertinent part:
 
 
 26
 [B]enefit levels for older workers may be reduced to the extent necessary to achieve approximate equivalency in cost for older and younger workers. A benefit plan will be considered in compliance with the statute where the actual amount of payment made, or cost incurred, in behalf of an older worker is equal to that made or incurred in behalf of a younger worker, even though the older worker may thereby receive a lesser amount of benefits or insurance coverage.
 
 
 27
 29 C.F.R. S 1625.10(a)(1). Appellants argued that the County has not satisfied the equal benefit or equal cost standard because it is spending less for health coverage for retirees age 65 and over as compared to younger retirees while simultaneously providing the older retirees inferior coverage under SecurityBlue.[3] Erie County, 91 F. Supp.2d at 865.
 
 
 28
 The County argued that it based its decision to place Medicare-eligible retirees in SecurityBlue not on age but on three age-neutral factors: (1) active versus inactive employment status, (2) cost, and (3) availability of plans. Id. In the alternative, the County argued that it is entitled to the affirmative defense set forth in section 4(f)(1) of the ADEA, 29 U.S.C. S 623(f)(1), which provides that it shall not be unlawful for an employer "to take any action otherwise prohibited under subsection[ ] (a) . . . of this section . . . where the differentiation is based on reasonable factors other than age." The County further argued that the equal benefit or equal cost standard under section 623(f)(2)(B)(i) has been satisfied.
 
 
 29
 The district court ruled on the motions in an opinion entered September 30, 1999. The court found that there were no disputed facts as to the nature of the County's policy regarding retiree health coverage:
 
 
 30
 [I]t is undisputed that the triggering feature for SecurityBlue coverage was, and is, eligibility for Medicare Part B Medical Insurance, coupled with the proviso that the insured must reside in the SecurityBlue service area. While age is one factor that triggers eligibility for Medicare coverage, it is not the only one, because individuals may be eligible for Medicare if they are disabled. In fact, the record shows that at least some retirees under the age of 65 were placed in the SecurityBlue Plan on account of their disability, not their age. The County also notes that Medicare-eligible retirees residing outside of the SecurityBlue service area are not eligible for SecurityBlue, and therefore remain covered under the former traditional indemnity plan.
 
 
 31
 We conclude that there is no genuinely disputed issue of fact as to the nature of the County's policy of providing health care benefits to its former employees. The undisputed evidence shows that former employees who were eligible for continuing health care coverage under the terms of the Retirement Board's December 12, 1995 resolution were offered coverage under the least expensive plan (that is, least expensive to the County) for which they qualified. Consequently, retirees who were Medicare-eligible were placed in SecurityBlue if they lived in the applicable service area. Those retirees who lived in the SelectBlue service area but who were not Medicare-eligible (either by virtue of age or disability) were placed in SelectBlue. Those retirees who did not qualify for SecurityBlue or SelectBlue (e.g., those who maintain residence outside of Western Pennsylvania) were offered health insurance under the traditional indemnity plan.
 
 
 32
 Erie County, 91 F. Supp.2d at 865-66.
 
 
 33
 The district court held that "eligibility for Medicare is an age-based factor" and thus appellants had made a "prima facie showing of age-based discrimination." Id. at 868 & n.11. The court reasoned as follows:
 
 
 34
 Medicare eligibility and residency within the SecurityBlue service area are both necessary--i.e., `but for'--conditions for receiving coverage under the SecurityBlue plan. To the Court's knowledge, none of the Plaintiffs are disabled so as to be independently eligible for Medicare on that basis. Rather, for the Plaintiffs, eligibility for Medicare followed ineluctably upon attaining age 65. Plaintiffs' age was a determinative factor in their placement in the SecurityBlue Plan because, if not for their age, they would not be placed in that plan. The non-age factor[ ] at issue in Hazen [Paper Co. v. Biggins, 507 U.S. 604, 113 S.Ct. 1701 (1993)] . . . therefore, [is] distinguishable.
 
 
 35
 Erie County, 91 F. Supp.2d at 867.
 
 
 36
 Despite this conclusion, the court ultimately held that the County was entitled to a partial summary judgment because "the ADEA clearly was not intended to apply to retirees, like the Plaintiffs here, who premise their complaint on alleged disparities in their retirement health benefits based on Medicare-eligibility." Id. at 880. In so ruling, the court was influenced by indications in the legislative history of the Older Workers Benefit Protection Act ("OWBPA"), Pub. L. No. 101-433, 104 Stat. 978 (1990), that members of Congress viewed the ADEA as permitting employers to offer inferior health benefits to Medicare- eligible retirees. The court rejected appellants' argument that the County could prevail only if it satisfied the equal benefit or equal cost standard under section 623(f)(2)(B)(i). Based on the presence of the term "older worker" in that provision, the court determined that Congress intended the equal benefit or equal cost standard to apply only with respect to benefits for active employees; accordingly, the court held that the County was entitled to judgment regardless of whether its health insurance scheme satisfied the equal benefit or equal cost standard.[4] See Erie County, 91 F. Supp.2d at 868-80.
 
 
 37
 In essence, it appears that the district court simply recognized an additional safe harbor for an employer who treats its Medicare-eligible retirees less favorably with respect to health benefits than other retirees--a safe harbor which does not require the employer to satisfy the equal benefit or equal cost standard. The district court's reasoning is illustrated by the following passage:
 
 
 38
 Notably, S 4(f)(2)(B)(i) [of the ADEA] refers to `older workers' and `younger workers,' terms that, although undefined in the ADEA, suggest a more narrow and precise scope of protection. Congress did not use in S 4(f)(2)(B)(i) the broader term `employees' . . . . Nor did Congress choose to employ the broader and more generic term `individual' in S 4(f)(2(B)(i). Cf. 29 U.S.C.A. S 623(a)(1).
 
 
 39
 The statutory language thus seems to present somewhat of an anomaly. `Individuals' are broadly protected against discrimination in terms of their employee benefits. However, employers may, consistent with the equal cost/equal benefit principle, engage in limited forms of age-based discrimination as against `older workers.' In order to succeed under the theory they are advancing, Plaintiffs must be both `individuals' and `older workers'--terms which are not defined by the statute . . . .
 
 
 40
 . . . .
 
 
 41
 We would reject any interpretation of the ADEA under which Plaintiffs would claim to be `individuals'-- and thus entitled to the broad protection of S 4(a)(1)-- but not `older workers' subject to the limited `equal cost/equal benefit' defense of S 4(f)(2)(B)(i). Under such an interpretation, retirees like Plaintiffs would receive greater protection under the ADEA than active employees. This is a result which, in our view, could not have been intended under the Act.
 
 
 42
 Erie County, 91 F. Supp.2d at 869-70 & n.14 (citation omitted).
 
 
 43
 Following the grant of partial summary judgment in favor of the County, appellants' counsel "represented on the record that the remainder of the ADEA claim [i.e. the claim that members of the plaintiff class have been treated less favorably than active employees] was being withdrawn." Mem. Order Dated Oct. 18, 1999, at 2. The district court, concluding that "all aspects of the ADEA [claim] have been adjudicated or otherwise withdrawn," declined to exercise jurisdiction over the state law claims in Count II, id., and thus it dismissed the state law claims without prejudice and closed the case. Appellants now appeal from the grant of summary judgment. The sole substantive question before us is whether the district court erred in dismissing appellants' claim that the County violated the ADEA by treating them less favorably than retirees under age 65 with respect to health coverage.
 
 II. JURISDICTION
 
 44
 The district court had jurisdiction over this matter pursuant to 28 U.S.C. SS 1331 and 1367. The matter of our jurisdiction to hear this appeal under 28 U.S.C. S 1291 requires more detailed discussion.
 
 
 45
 According to appellants' brief, they withdrew the remaining portion of their ADEA claim before the district court "without prejudice." See appellants' br. at 6. Moreover, the district court dismissed the action on that basis. Of course, ordinarily we do not have jurisdiction under 28 U.S.C. S 1291 of an appeal from an order partially adjudicating a case when an appellant has asserted a claim in the district court which it has withdrawn or dismissed without prejudice. See Nyhuis v. Reno, 204 F.3d 65, 68 n.2 (3d Cir. 2000); West v. Macht, 197 F.3d 1185, 1187-90 (7th Cir. 1999); Bhatla v. U.S. Capital Corp., 990 F.2d 780, 786 (3d Cir. 1993). Accordingly, we requested the parties to submit memoranda with respect to our jurisdiction. The appellants responded as follows:
 
 
 46
 To eliminate any possible confusion, Appellants hereby represent that they withdraw finally and with prejudice any claim under the ADEA that the differences in benefits between Appellants, as retirees, and active County employees violates the ADEA. Appellants stand on only their ADEA claim, as raised in their motion for partial summary judgment . . ., that the differences in benefits between Appellants and County retirees under age 65 violate the ADEA. Appellants do not and need not withdraw their state law claim in Count 2 of the complaint.
 
 
 47
 Appellants' letter at 6. Inasmuch as appellants are withdrawing with prejudice any ADEA claim not disposed of by the district court's September 30, 1999 order, we have jurisdiction under 28 U.S.C. S 1291.
 
 
 48
 We also note that Judge Shadur believes that inasmuch as the district court dismissed the state law claims without prejudice because it declined to assert jurisdiction over them, the judgment is not final and thus we do not have jurisdiction. This position is contrary to the understanding of the judges of this court, as we regularly exercise jurisdiction over an appeal from the adjudication of the federal claims in such circumstances. See, e.g., Reitz v. County of Bucks, 125 F.3d 139, 143, 148 (3d Cir. 1997).
 
 
 49
 Our practice clearly is correct for case law indicates that a court of appeals has jurisdiction under 28 U.S.C. S 1291 when the district court has divested itself of a case entirely, regardless of the fact that claims in the case may continue to go forward in state court. See Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 711-15, 116 S.Ct. 1712, 1718-20 (1996) (holding that a district court order remanding a removed action to state court on abstention grounds was appealable under section 1291 because it "put[ ] the litigants in this case effectively out of court, . .. and its effect is precisely to surrender jurisdiction of a federal suit to a state court.") (citation and internal quotation marks omitted); Hudson United Bank v. LiTenda Mortgage Corp., 142 F.3d 151, 155 (3d Cir. 1998) (jurisdiction existed under section 1291 over a district court order dismissing federal claims in an action removed from state court, despite the fact that the district court exercised its discretion under 28 U.S.C. S 1367(c) to remand supplemental state law claims to the state court); Pennsylvania Nurses Ass'n v. Pennsylvania State Educ. Ass'n, 90 F.3d 797, 801 (3d Cir. 1996) (jurisdiction existed under section 1291 when the district court dismissed certain counts in an action removed from state court and remanded others pursuant to 28 U.S.C. S 1367(c); "[B]ecause the district court's remand order divested the federal court of all control over the action, our cases suggest that we would have jurisdiction under 28 U.S.C. S 1291."); In re U.S. Healthcare, Inc., 193 F.3d 151, 159 (3d Cir. 1999) (same; following Pennsylvania Nurses), cert. denied, 120 S.Ct. 2687 (2000); McLaughlin v. Arco Polymers, Inc., 721 F.2d 426, 428 n.1 (3d Cir. 1983) (jurisdiction existed under section 1291 to review a district court order transferring an action to state court due to lack of diversity jurisdiction; "The order below finding a lack of subject matter jurisdiction and transferring the action divested the court of all control of the action and is appealable as a final order."); see also Trent v. Dial Med. of Florida, Inc., 33 F.3d 217, 220 (3d Cir. 1994) ("Even dismissals without prejudice have been held to befinal and appealable if they `end [ ] [the] suit so far as the District Court was concerned . . . .' ") (citation omitted); Anderson v. Allstate Ins. Co., 630 F.2d 677, 681 (9th Cir. 1980) ("There is no danger of piecemeal appeal[s] confronting us if we find jurisdiction here, for nothing else remains in the federal courts.").
 
 
 50
 We recognize, of course, that Judge Shadur has cited numerous cases in support of his position. We have examined them all and conclude that none is apposite inasmuch as none involves a dismissal without prejudice of state law claims on the basis of the district court declining to exercise supplemental jurisdiction over them. While the district court's order in this case did permit appellants to reinstitute their dismissed state law claims, they could do so only in state court, as there would be no basis for the district court to exercise jurisdiction over such a reinstituted action. Thus, we have jurisdiction over this appeal.
 
 III. DISCUSSION
 
 51
 Our resolution of the issue presented on this appeal requires a detailed analysis of the OWBPA as well as the circumstances which led to its enactment. Our standard of review is plenary. See Seibert v. Nusbaum, Stein, Goldstein, Bronstein & Compeau, 167 F.3d 166, 170 (3d Cir. 1999). We will review the relevant background before proceeding to our analysis.
 
 A. The OWBPA
 1. Events preceding passage of the OWBPA
 
 52
 The OWBPA, passed in 1990, made several amendments to the ADEA. Congress passed the OWBPA for the express purpose of overruling the Supreme Court's decision in Public Employees Retirement System of Ohio v. Betts, 492 U.S. 158, 109 S.Ct. 2854 (1989). See S. Rep. No. 101-263, at 16-17 (1990), reprinted in 1990 U.S.C.C.A.N. 1509, 1521-22; Auerbach, 136 F.3d at 111-12. At the time of the Betts decision, section 4(f)(2) of the ADEA, 29 U.S.C. S 623(f)(2), provided that it was not unlawful for an employer "to observe the terms of . . . any bonafide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of " the ADEA. See Betts, 492 U.S. at 165, 109 S.Ct. at 2860. The governing interpretation of this version of section 4(f)(2) was provided by 29 C.F.R. S 1625.10, which employed the equal benefit or equal cost standard to determine if an employee benefit plan was a "subterfuge" to evade the purposes of the ADEA. See 29 C.F.R. S 1625.10 (1989); S. Rep. No. 101-263, at 8-12 (1990), reprinted in 1990 U.S.C.C.A.N. 1509, 1512-17.[5] The regulation provided:
 
 
 53
 In order for a bona fide employee benefit plan which prescribes lower benefits for older employees on account of age to be within the section 4(f)(2) exception, it must not be `a subterfuge to evade the purposes of [the] Act.' In general, a plan or plan provision which prescribes lower benefits for older employees on account of age is not a `subterfuge' within the meaning of section 4(f)(2), provided that the lower level of benefits is justified by age-related cost considerations.
 
 
 54
 29 C.F.R. S 1625.10(d) (1989). Based on this regulation, it was held prior to Betts that an employer could avail itself of the section 4(f)(2) safe harbor only if it provided either equal benefits to older and younger workers or incurred equal costs on behalf of each. See S. Rep. No. 101-263, at 8-12, 18 (1990), reprinted in 1990 U.S.C.C.A.N. 1509, 1512-17, 1523; Auerbach, 136 F.3d at 111 (Prior to Betts, "for a plan to comply with the ADEA, the employer had to show that it either provided the same benefits to older employees or incurred the same costs on behalf of older employees. Under this `equal benefit or equal cost' principle, so long as the employer could provide a cost- based justification for the disparate benefits, the plan would not be a `subterfuge.' ").
 
 
 55
 In Betts, the Supreme Court viewed the law quite differently. The Court rejected the equal benefit or equal cost principle of 29 C.F.R. S 1625.10 as inconsistent with the plain meaning of the word "subterfuge," which the Court viewed as "a scheme, plan, stratagem, or artifice of evasion." See Betts, 492 U.S. at 169-75, 109 S.Ct. at 2862- 65. Instead, the Court interpreted section 4(f)(2) as "exempting the provisions of a bona fide benefit plan from the purview of the ADEA so long as the plan is not a method of discriminating in other, non-fringe-benefit aspects of the employment relationship." Id. at 177, 109 S.Ct. at 2866. Thus, "under this construction of the statute, Congress left the employee benefit battle for another day, and legislated only as to hiring and firing, wages and salaries, and other non-fringe-benefit terms and conditions of employment." Id., 109 S.Ct. at 2867. The Court placed a substantial burden on a plaintiff seeking to challenge age-based discrimination in employee benefits:
 
 
 56
 [W]hen an employee seeks to challenge a benefit plan provision as a subterfuge to evade the purposes of the Act, the employee bears the burden of proving that the discriminatory plan provision actually was intended to serve the purpose of discriminating in some non-fringe- benefit aspect of the employment relation.
 
 
 57
 Id. at 181, 109 S.Ct. at 2868.
 
 
 58
 The Court of Appeals for the Second Circuit has described the implications of Betts as follows:
 
 
 59
 According to the Court [in Betts],S 4(f)(2) provided a broad exemption for employee benefit plans under the ADEA, and therefore the general prohibitions regarding the unlawfulness of discrimination against older employees found in S 4(a)(1) did not apply to employee benefit plans . . . .
 
 
 60
 . . . [T]he Court rejected the `equal benefit or equal cost' principle by determining that an employer need not demonstrate a legitimate cost justification for age- based reductions in benefits . . . . Instead, the Court required an employee to prove that the challenged plan intended to serve the purpose of discriminating in some non-fringe-benefit aspect of the employment relation, such as hiring, firing and wages, in order to establish an ADEA violation. This interpretation would effectively validate virtually all age-based restrictions in [employee benefit plans] absent the requisite showing by an employee that the employer subjectively intended to discriminate.
 
 
 61
 Auerbach, 136 F.3d at 111 (citations and internal quotation marks omitted).
 
 2. Passage of the OWBPA
 
 62
 Congress acted quickly to overrule Betts. Section 101 of the OWBPA clearly stated Congress' purpose:
 
 
 63
 The Congress finds that, as a result of the decision of the Supreme Court in Public Employees Retirement System of Ohio v. Betts . . . legislative action is necessary to restore the original congressional intent in passing and amending the Age Discrimination in Employment Act of 1967 (29 U.S.C. 621 et seq.), which was to prohibit discrimination against older workers in all employee benefits except when age-based reductions in employee benefit plans are justified by significant cost considerations.
 
 
 64
 OWBPA S 101. Section 102 of the OWBPA specifically defined the term "compensation, terms, conditions, or privileges of employment" in the ADEA to include "all employee benefits." OWBPA S102 (codified at 29 U.S.C. S 630(l)); see also S. Rep. No. 101-263, at 16 (1990), reprinted in 1990 U.S.C.C.A.N. 1509, 1521-22 ("Through this legislation, Congress intends to make unmistakably clear that the ADEA's purpose of eliminating arbitrary age discrimination in employment includes the elimination of age discrimination in all forms of employee benefits."). Section 103 of the OWBPA deleted the "subterfuge" language in section 4(f)(2) of the ADEA and replaced it with the current provision, including the express codification of the equal benefit or equal cost standard in section 4(f)(2)(B)(i). OWBPA S 103(1) (codified at 29 U.S.C. S 623(f)(2)). By making this change, Congress intended "to make clear that . . . the only justification for age discrimination in an employee benefit is the increased cost in providing the particular benefit to older individuals." S. Rep. No. 101-263, at 18 (1990), reprinted in 1990 U.S.C.C.A.N. 1509, 1523 (emphasis in original); see also Auerbach, 136 F.3d at 112 ("Section 4(f)(2)(B)(i) [as adopted in the OWBPA] governs employee benefits and expressly adopts the `equal benefit or equal cost' principle, once and for all, ending judicial speculation as to the exact meaning of the earlier `subterfuge' provision."). Section 103 of the OWBPA also clarified that the burden is on the employer to establish that the equal benefit or equal cost standard has been satisfied. OWBPA S 103(1) (codified at 29 U.S.C. S 623(f)(2)).
 
 
 65
 The OWBPA made further changes to the ADEA, including the addition of a safe harbor allowing employers to deduct the value of retiree health benefits and pension "sweeteners" from severance pay in the event of a "contingent event unrelated to age," such as a plant shutdown or lay-off. OWBPA S 103(3) (codified at 29 U.S.C. S 623(l)(2)).
 
 3. Legislative history of the OWBPA
 
 66
 Numerous items in the legislative history of the OWBPA are relevant to the issue now before us. We will review these items in chronological order.
 
 
 67
 On April 5, 1990, the Senate Committee on Labor and Human Resources issued its report on S. 1511, which eventually became the OWBPA. The report commented as follows regarding retiree health benefits and Medicare:
 
 
 68
 The Committee intends to approve the . . . practice of integrating retiree health benefits with Medicare, which is already permitted under the regulation. See 29 C.F.R. 1625.10(e). The availability of Medicare benefits from the federal government will not justify a reduction in employer-provided retiree health benefits if the result is that, taking the employer-provided and government-provided benefits together, an older retiree is entitled to a lesser benefit of any type . . . than a similarly situated younger retiree. See id.
 
 
 69
 S. Rep. No. 101-263, at 21-22 (1990), reprinted in 1990 U.S.C.C.A.N. 1509, 1527.
 
 
 70
 The regulatory provision cited by the Senate Committee, 29 C.F.R. S 1625.10(e), is entitled "Benefits provided by the Government" which reads:
 
 
 71
 An employer does not violate the Act [ADEA] by permitting certain benefits to be provided by the Government, even though the availability of such benefits may be based on age. For example, it is not necessary for an employer to provide health benefits which are otherwise provided to certain employees by Medicare. However, the availability of benefits from the Government will not justify a reduction in employer- provided benefits if the result is that, taking the employer-provided and Government-provided benefits together, an older employee is entitled to a lesser benefit of any type . . . than a similarly situated younger employee. For example, the availability of certain benefits to an older employee under Medicare will not justify denying an older employee a benefit which is provided to younger employees and is not provided to the older employee by Medicare.
 
 
 72
 29 C.F.R. S 1625.10(e) (1989). This provision, and the Senate Committee's apparent approval of it,[6] supports appellants' argument that the equal benefit or equal cost standard applies and must be satisfied when an employer reduces health benefits for retirees eligible for Medicare.
 
 
 73
 S. 1511 was debated on the floor of the Senate later in 1990. During the debates, Senator Grassley entered into the record several concerns he had about the bill, including the following:
 
 
 74
 Some companies do provide health insurance coverage for retirees, but cease such insurance coverage when the retiree becomes eligible for Medicare. Thus, such companies would be spending more for their younger retirees, who are not eligible for Medicare, than for their older retirees, who are receiving Medicare.
 
 
 75
 If the bill is enacted, would such a company be in violation of the law? Is that the sponsors [sic] intention? If not, what provision in the bill protects employers in such circumstances?
 
 
 76
 136 Cong. Rec. S13, 297-98 (daily ed. Sept. 18, 1990).
 
 
 77
 On September 24, 1990, an amended final substitute version of S. 1511 was proposed on behalf of Senators Metzenbaum, Hatch, Pryor, Heinz, and Jeffords. See 136 Cong. Rec. S13, 594 (daily ed. Sept. 24, 1990). This final substitute represented a compromise among the bill's managers. See 136 Cong. Rec. S13,597 (daily ed. Sept. 24, 1990) (statement of Sen. Metzenbaum). One of the compromise points was to "[c]hange the word `individual' in section 4(f)(2)(B) [of the ADEA] back to `worker.' " 136 Cong. Rec. S13,599 (daily ed. Sept. 24, 1990) ("Summary of Pryor-Hatch-Metzenbaum-Heinz Agreement on Betts Legislation"). The legislative history does not reveal why the managers made this change.
 
 
 78
 The same day, a Statement of Managers for the final substitute was entered into the record. The Statement included the following passage, captioned "Retiree Health":
 
 
 79
 Many employer-sponsored retiree medical plans provide medical coverage for retirees only until the retiree becomes eligible for Medicare. In many of these cases, where coverage is provided to retirees only until they attain Medicare eligibility, the value of the employer-provided retiree medical benefits exceeds the value of the retiree's Medicare benefits. Other employers provide medical coverage to retirees at a relatively high level until the retirees become eligible for Medicare and at a lower level thereafter. In many of these cases, the value of the medical benefits that the retiree receives before becoming eligible for Medicare exceeds the total value of the retiree's Medicare benefits and the medical benefits that the employer provides after the retiree attains Medicare eligibility. These practices are not prohibited by this substitute. Similarly, nothing in this substitute should be construed as authorizing a claim on behalf of a retiree on the basis that the actuarial value of employer- provided health benefits available to that retiree not yet eligible for Medicare is less than the actuarial value of the same benefits available to a younger retiree.
 
 
 80
 136 Cong. Rec. S13,597 (daily ed. Sept. 24, 1990) (emphasis added). This passage indicates an intent to permit employers to reduce or eliminate health benefits for Medicare-eligible retirees without satisfying the equal benefit or equal cost standard.
 
 
 81
 Senator Hatch made the following pertinent comments after the Statement of Managers was entered into the record:
 
 
 82
 Many employers continue health benefits for persons who retire before they are eligible for Medicare and/or continue certain benefits that are supplemental to Medicare.
 
 
 83
 This is a positive practice which helps provide important protections for retirees.
 
 
 84
 This compromise ensures that the bill will not interfere with these important benefits that are vital to retirees of all ages.
 
 
 85
 . . . .
 
 
 86
 It has been our policy to encourage employers to provide generous employee benefits. Clearly, this objective is frustrated, if not defeated, if Congress enacts legislation that so heavily encumbers American companies that they must reduce or eliminate such benefits.
 
 
 87
 . . . .
 
 
 88
 We must be concerned about the impact on all employees of additional Federal requirements that unnecessarily complicate existing arrangements or that will shift a firm's resources from actual benefits into regulatory compliance or litigation.
 
 
 89
 If an employer is forced to reduce or eliminate benefits for some workers to avoid litigation exposure or to avoid going afoul of the law, we have to ask the question: Is it worth it?
 
 
 90
 136 Cong. Rec. S13,600 (daily ed. Sept. 24, 1990).
 
 
 91
 Comments made during the Senate debate reveal that some Senators were concerned primarily with prohibiting age-based benefits discrimination against older active employees--discrimination which might force those employees into early retirement. See 136 Cong. Rec. S13,601 (daily ed. Sept. 24, 1990) (statement of Sen. Adams) ("We should not allow [older workers] to be forced out by policies that . . . overly discriminate against them because of age . . . ."); 136 Cong. Rec. S13,602 (daily ed. Sept. 24, 1990) (statement of Sen. Heinz) ("Although more subtle than mandatory retirement, discrimination of[sic] employee benefits can, and it does, coerce workers into early resignation and retirement."). Yet, Senator Kerry made a statement indicating that he believed the bill would aid retirees as well as active employees. See 136 Cong. Rec. S13,608 (daily ed. Sept. 24, 1990) (statement of Sen. Kerry) ("Older individuals depend on employee benefits to protect them from what can amount to crippling medical care costs as well as to provide them with a secure retirement.").
 
 
 92
 Later in the debate, Senators Bentsen and Pryor engaged in an exchange regarding retiree health coverage. Senator Pryor expressed the view that the ADEA does not apply to retirees except when a person's retirement benefits are "discriminatorily structured" prior to retirement:
 
 
 93
 MR. BENTSEN. Is it the understanding of the Senator that the Age Discrimination in Employment Act does not apply to retirees?
 
 
 94
 MR. PRYOR. The distinguished Senator is correct. The ADEA applies only to employees and those individuals seeking employment. However, it does apply to an individual whose retirement benefits are discriminatorily structured prior to retirement.
 
 
 95
 136 Cong. Rec. S13,609 (daily ed. Sept. 24, 1990). Senator Bentsen then expressed concern about the lawfulness of the Texas Teacher Retirement System, which employed a Medicare Part B "carve out" and therefore provided less health coverage to retirees 65 and over than to younger retirees. Senator Bentsen indicated that this was an "age based distinction" which "at least raises the issue of whether the system is violating the ADEA's ban against age discrimination in employee benefits." The following exchange then took place:
 
 
 96
 [MR. BENTSEN.] If the system pays approximately the equivalent amount to purchase the private insurance for the prospective retiree under 65 as for the prospective retiree 65 or older, does the system's retiree health packages [sic] violate the ADEA as amended by this bill?
 
 
 97
 MR. PRYOR. I would say to my good friend from Texas that I wish I could give him a more definite answer than the one I am about to give. I know that he wants to provide a comfort level with this legislation for the Texas State Teacher's Retirement System.
 
 
 98
 The purpose of equal benefit or equal cost is to allow employers to take account of the fact that the cost of some benefits rises with the age of the employee. If your scenario is correct and the system spends the same amount in acquiring health coverage for all prospective retirees regardless of age, I would say that the system has a good argument that it has satisfied the equal benefit or equal cost principle.
 
 
 99
 136 Cong. Rec. S13, 609-10 (daily ed. Sept. 24, 1990).
 
 
 100
 This exchange indicates that the equal benefit or equal cost standard is applicable when an employer reduces its coverage for Medicare-eligible retirees. However, the context of the exchange--including the use of the term "prospective retiree"--indicates that the Senators limited their discussion to cases where the retiree health program is "discriminatorily structured prior to retirement." In the case before us, it is apparent that SecurityBlue was adopted after the class members retired. See Erie County, 91 F. Supp.2d at 875; App. at 13.
 
 
 101
 S. 1511 was passed by the Senate on September 24, 1990, and subsequently considered by the House of Representatives. See 136 Cong. Rec. S13,611 (daily ed. Sept. 24, 1990); 136 Cong. Rec. H8614 (daily ed. Oct. 2, 1990). In the House, Representative Clay introduced into the record an "Explanation of S. 1511" which expressed a similar view as that espoused by Senator Pryor regarding the applicability of the ADEA to retirees:
 
 
 102
 Since the ADEA covers only employees and those individuals seeking employment, nothing in the bill would apply the provisions of the ADEA to retirees. Thus, for example, it would not be a violation of the ADEA, if an employer provided an ad hoc cost-of-living adjustment to all current retirees above a certain age. Of course, nothing in the bill would alter the current protection under the ADEA for an employee whose retirement or health benefits are discriminatorily structured based on age at the time of retirement. Thus the `equal benefit or equal cost' rule would continue to apply to any such promise upon retirement.
 
 
 103
 136 Cong. Rec. H8618 (daily ed. Oct. 2, 1990).
 
 
 104
 Later, Representative Goodling introduced into the record a summary of the "improvements" in the final version of S. 1511. According to the summary, the bill "clarifie[s] that employers are not required to provide equivalent retiree health coverage to Medicare eligible and pre-Medicare eligible retirees." 136 Cong. Rec. H8621 (daily ed. Oct. 2, 1990). If such was Congress' intent, however, we do not see any language in the OWBPA making the point clear.[7] Accordingly, we are left with a rather difficult task of statutory interpretation in this case.
 
 
 105
 We proceed now to our analysis of the matter. While the legislative history may provide assistance in resolving ambiguity, the language of the statute must guide us in the first instance. See In re Unisys Sav. Plan Litig., 74 F.3d 420, 444 (3d Cir. 1996).
 
 B. Analysis
 
 106
 1. Section 4(a)(1) of the ADEA, 29 U.S.C. S 623(a)(1)
 
 
 107
 The first step in our analysis is to determine whether plaintiffs have established a claim of age discrimination under section 4(a)(1) of the ADEA, 29 U.S.C. S 623(a)(1). That provision makes it unlawful for an "employer" to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." Obviously, all members of the plaintiff class are "individuals." The question arises, then, whether members of the class--who had ceased actively working before they were placed in SecurityBlue--have been treated less favorably by their "employer" with respect to their "compensation, terms, conditions, or privileges of employment." The latter phrase is explicitly defined in the ADEA, as amended by the OWBPA, to include "all employee benefits." See 29 U.S.C. S 630(l). The term "employee benefits" is not defined in the statute, but the terms "employer" and "employee" are. See 29 U.S.C. SS 630(b), (f) ("The term `employer' means a person engaged in an industry affecting commerce who has twenty or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year . . . ."; "The term `employee' means an individual employed by any employer . . . ."). We believe that the ordinary meaning of the term "employee benefit" should be understood to encompass health coverage and other benefits which a retired person receives from his or her former employer.
 
 
 108
 The Supreme Court's decision in Robinson v. Shell Oil Co., 519 U.S. 337, 117 S.Ct. 843 (1997), supports our interpretation. Robinson addressed the applicability of the anti-retaliation provision in Title VII of the Civil Rights Act of 1964 to actions taken against former employees. See id. at 339, 117 S.Ct. at 845. The plaintiff in Robinson had filed an EEOC charge alleging that Shell discharged him because of his race. Id. When the plaintiff applied for a job with another company, Shell allegedly retaliated against him by issuing a negative reference. Id. Title VII's anti-retaliation provision, section 704(a), 42 U.S.C. S 2000e-3(a)--which is nearly identical to the ADEA's anti-retaliation provision, see 29 U.S.C. S 623(d)--makes it unlawful "for an employer to discriminate against any of his employees or applicants for employment" because they have opposed discrimination. Section 701(f) of Title VII, 42 U.S.C. S 2000e(f), defines "employee" as "an individual employed by an employer"-- the same definition present in the ADEA. The Court in Robinson stated that, "[a]t first blush, the term `employees' . . . would seem to refer to those having an existing employment relationship with the employer in question." Robinson, 519 U.S. at 341, 117 S.Ct. at 846. However, the Court found that "[t]his initial impression .. . does not withstand scrutiny" because "the word `employed' [in the definition of `employee'] . . . could just as easily be read to mean `was employed.' " Id. at 341, 342, 117 S.Ct. at 846, 847. The Court thus found the term "employees" to be "ambiguous as to whether it excludes former employees." Id. at 341, 117 S.Ct. at 846. The Court then construed this ambiguity in favor of Title VII's broad remedial purposes, and thus held that the anti-retaliation provision covered former employees. See id. at 345-46, 117 S.Ct. at 848-49.
 
 
 109
 Robinson indicates that an employer's adverse actions taken against someone who has ceased actively working for that employer may constitute discrimination against an "employee." By analogy, an employer who treats retirees differently with respect to their health coverage because of their age may have engaged in discrimination with respect to "employee benefits."
 
 
 110
 The Robinson Court did note that the term "employee" may not have "the same meaning in all other sections [of Title VII] and in all other contexts"; thus, "each section must be analyzed to determine whether the context gives the term a further meaning that would resolve the issue in dispute." See id. at 343-44, 117 S.Ct. at 847. Nevertheless, we believe that the term "employee benefits" as used in 29 U.S.C. S 630(l) is broad enough to encompass retiree health coverage. See Arizona Governing Comm. for Tax Deferred Annuity and Deferred Compensation Plans v. Norris , 463 U.S. 1073, 1079, 1081, 103 S.Ct. 3492, 3496, 3497-98 (1983) ("There is no question that the opportunity to participate in a deferred compensation plan constitutes a `conditio[n] or privileg[e] of employment' [within the meaning of Title VII's main prohibitory provision], and that retirement benefits constitute a form of `compensation.' "; "We have no hesitation in holding . . . that the classification of employees on the basis of sex is no more permissible at the pay-out stage of a retirement plan than at the pay-in stage.").
 
 
 111
 We recognize that there are statements in the legislative history of the OWBPA which indicate that certain members of Congress viewed the ADEA as inapplicable to retirees except when a retiree's benefits are "discriminatorily structured prior to retirement." But we see nothing in the language of the ADEA to indicate that these statements are accurate and we do not find them to be persuasive. As the EEOC points out in its amicus brief, such an approach could lead to anomalous results:
 
 
 112
 If Congress intended to broadly prohibit discrimination in `all' employee benefits, including benefits that are available in the post-employment period, there is every reason to believe that Congress intended the protections of the statute to extend to discrimination that occurs in the post-employment period.
 
 
 113
 Indeed, any other view of the statute would lead to irrational gaps in coverage that Congress could not have intended. It is clear that the ADEA covers discrimination in a post-employment benefit where the facially discriminatory policy is instituted while an individual is still an active employee. The individual could challenge the policy at the time of its adoption or upon retirement, when the policy is applied to the individual. The individual in such a case would have a claim even if the discrimination policy was adopted one day prior to the individual's date of retirement. Yet, if the policy were adopted two days later, one day after the date of retirement, the individual, as a `retiree,' would be without a claim under the ADEA. It is inconceivable that Congress would in the same breath expressly prohibit discrimination in employee benefits, yet allow employers to discriminatorily deny or limit post-employment benefits to former employees at or after their retirement, although they had earned those employee benefits through years of service with the employer.
 
 
 114
 EEOC's br. at 16-17 (citation and internal quotation marks omitted). We find the EEOC's argument to be persuasive, and accordingly we conclude that the ADEA applies even when retiree benefits are structured discriminatorily after retirement.[8]
 
 
 115
 In sum, we conclude that members of the plaintiff class are "individuals" who have been treated differently by their "employer" "with respect to [their] compensation, terms, conditions, or privileges of employment." The next question that arises is whether the class members have been so treated "because of . . . age."[9] The County argues that the decision to place Medicare-eligible retirees in SecurityBlue was motivated not by age but by three other factors: (1) active versus inactive employment status, (2) cost, and (3) availability of plans. The County argues that it simply placed each retiree in "the plan that is the least expensive to the County for which he or she qualifies." See appellee's br. at 44-45.
 
 
 116
 The County relies on Hazen Paper Co. v. Biggins, 507 U.S. 604, 113 S.Ct. 1701 (1993). In that case, the Supreme Court held that a claim for disparate treatment under the ADEA could not be maintained where the 62-year-old plaintiff was terminated a few weeks shy of attaining the ten years of service which he needed for his pension benefits to vest. Id. at 606-13, 113 S.Ct. at 1704-08. In so ruling, the Court stated that "there is no disparate treatment under the ADEA when the factor motivating the employer is some feature other than the employee's age." Id. at 609, 113 S.Ct. at 1705. "When the employer's decision is wholly motivated by factors other than age, the problem of inaccurate and stigmatizing stereotypes disappears. This is true even if the motivating factor is correlated with age . . . ." Id. at 611, 113 S.Ct. at 1706 (emphasis in original). The Court found that "age and years of service are analytically distinct . . . and thus it is incorrect to say that a decision based on years of service is necessarily `age based.' " Id., 113 S.Ct. at 1707. The Court implied that the result might have been different if pension vesting had been based on age rather than years of service. See id. at 613, 113 S.Ct. at 1707 ("[W]e do not consider the special case where an employee is about to vest in pension benefits as a result of his age, rather than years of service, and the employer fires the employee in order to prevent vesting. That case is not presented here.") (citation omitted) (emphasis in original).
 
 
 117
 We find Hazen Paper to be distinguishable. Medicare eligibility does not merely "correlate[ ] with age," see id. at 608, 113 S.Ct. at 1705, as does years of service. Rather, as the district court here pointed out, Medicare eligibility "follow[s] ineluctably upon attaining age 65." Erie County, 91 F. Supp.2d at 867. See 42 U.S.C. S 1395o. Thus, Medicare status is a direct proxy for age. This case is therefore parallel to the "special case" mentioned by the Court in Hazen Paper, where an adverse action is taken against a person because of a particular event (i.e. approaching pension vesting) and that event in turn occurs because the person has attained a certain age. See DiBiase v. SmithKline Beecham Corp., 48 F.3d 719, 730 n.12 (3d Cir. 1995) (implying that the ADEA is violated "when a company's policy distinguishes employees on the basis of a factor analytically indistinct from age").[10]
 
 
 118
 Johnson v. New York, 49 F.3d 75 (2d Cir. 1995), illustrates the point. In Johnson, the New York State Division of Military and Naval Affairs employed the plaintiff as an air base security guard. Id. at 76-77. A mandatory condition of his employment was the maintenance of "dual status" as an active member of the Air National Guard ("ANG"). Id. When the plaintiff turned 60, he was forced to resign from the ANG due to his age, and in turn he was fired from his security guard position. Id. The Court of Appeals for the Second Circuit held that the termination violated the ADEA. Id. at 78-80. The court commented as follows in distinguishing Hazen Paper:
 
 
 119
 The State's reliance on Hazen Paper is unavailing. The flaw in the State's argument is that the decision to require dual status [in the ANG], with consequent mandatory retirement at 60 . . . is not merely correlated with age; unlike Hazen Paper, the employer's decision here in fact implements an age-based criterion. Regardless of the State's reasons for requiring that certain of its civilian employees maintain ANG membership, there can be no doubt that [plaintiff 's] age actually played a role and had a determinative influence on the decision to terminate his employment. In this case, age and termination are inextricably linked. The sole reason for [plaintiff 's] loss of dual status and his consequent termination was age.
 
 
 120
 Id. at 79-80 (citation and internal quotation marks omitted).[11] Similarly, in our case, the County "implement[ed] an age-based criterion" by placing Medicare-eligible retirees in SecurityBlue.[12]
 
 
 121
 The fact that there is no reason to believe that the County possessed a malevolent motive or acted on the basis of hostile age-based stereotypes is irrelevant. The Supreme Court has indicated that a policy explicitly based on a prohibited factor--such as sex or age--is illegal regardless of the underlying motive:
 
 
 122
 [T]he absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect. Whether an employment practice involves disparate treatment through explicit facial discrimination does not depend on why the employer discriminates but rather on the explicit terms of the discrimination . . . . The beneficence of an employer's purpose does not undermine the conclusion that an explicit gender-based policy is sex discrimination . . . .
 
 
 123
 International Union v. Johnson Controls, Inc., 499 U.S. 187, 199-200, 111 S.Ct. 1196, 1203-04 (1991); see also City of Los Angeles Dep't of Water and Power v. Manhart, 435 U.S. 702, 704-18, 98 S.Ct. 1370, 1373-80 (1978) (holding that employer's policy requiring female employees to make larger pension fund contributions than male employees violated Title VII even though the policy merely sought to take into account the well-established fact of female longevity).
 
 
 124
 The County argues that it "never had the option of offering SelectBlue to Medicare-eligible retirees such as plaintiffs because the underwriting criteria adopted by Highmark Blue Cross/Blue Shield disqualified Medicare- eligible retirees from enrollment in SelectBlue." See appellee's br. at 49. However, the Supreme Court has indicated that an employer cannot avoid responsibility for a facially discriminatory benefit plan simply because the discrimination arises from the criteria imposed by outside entities with whom the employer has contracted to participate in providing the benefit. See Norris, 463 U.S. at 1086-91, 103 S.Ct. at 3500-03. In Norris, the State established a deferred compensation plan for its employees and selected several outside companies to participate in the plan. Id. at 1075-76, 103 S.Ct. at 3494-95. Those companies employed sex-based mortality tables to calculate monthly retirement benefits; as a result, male retirees received higher monthly payments than women who had made the same contributions. Id. at 1077, 103 S.Ct. at 3495. The Supreme Court held that the plan was a violation of Title VII. Id. at 1079-86, 103 S.Ct. at 3496-3500. The Court commented as follows regarding the State's argument that it was the outside companies that were responsible for calculating the benefits:
 
 
 125
 Under these circumstances there can be no serious question that [the State] [is] legally responsible for the discriminatory terms on which annuities are offered by the companies chosen to participate in the plan. Having created a plan whereby employees can obtain the advantages of using deferred compensation to purchase an annuity only if they invest in one of the companies specifically selected by the State, the State cannot disclaim responsibility for the discriminatory features of the insurers' options. Since employers are ultimately responsible for the `compensation, terms, conditions, [and] privileges of employment' provided to employees, an employer that adopts a fringe-benefit scheme that discriminates among its employees on the basis of race, religion, sex, or national origin violates Title VII regardless of whether third parties are also involved in the discrimination . . . . It would be inconsistent with the broad remedial purposes of Title VII to hold that an employer who adopts a discriminatory fringe benefit plan can avoid liability on the ground that he could not find a third party willing to treat his employees on a nondiscriminatory basis. An employer who confronts such a situation must either supply the fringe benefit himself . . . or not provide it at all.
 
 
 126
 Id. at 1089-91, 103 S.Ct. at 3501-03 (footnotes omitted).
 
 
 127
 In sum, we conclude that the County has treated appellants differently than other retirees with respect to their "compensation, terms, conditions, or privileges of employment, because of . . . age." Accordingly, appellants have established a claim of age discrimination under 29 U.S.C. S 623(a)(1), unless any of the ADEA's "safe harbors" is applicable.
 
 2. Safe harbors
 
 128
 Appellants contend that the only possibly applicable safe harbor under the ADEA is that set forth in 29 U.S.C. S 623(f)(2)(B)(i), which adopts the equal benefit or equal cost principle. Appellants argue that the County cannot satisfy that principle because it is providing lesser benefits to retirees age 65 and over as compared to younger retirees while simultaneously incurring lesser costs on the older retirees' behalf. The County argues that it is entitled to the benefit of the "reasonable factors other than age" defense set forth in 29 U.S.C. S 623(f)(1). The district court merely held that "the ADEA clearly was not intended to apply to retirees, like the Plaintiffs here, who premise their complaint on alleged disparities in their retirement health benefits based on Medicare-eligibility." Erie County, 91 F. Supp.2d at 880. Thus, the district court's view is that employers may treat Medicare-eligible retirees differently with respect to health benefits without meeting the equal benefit or equal cost standard. Effectively, then, the district court recognized a safe harbor in addition to any explicitly set forth in the ADEA or the OWBPA.
 
 
 129
 The legislative history, as described above, contains items indicating that members of the Congress which passed the OWBPA viewed the ADEA as having limited applicability to retirees. Some items in the legislative history directly express the view that employers lawfully may reduce or eliminate health coverage for Medicare-eligible retirees. We cannot, however, accept the district court's approach for the straightforward reason that it is not reflected in the actual language of the ADEA or the OWBPA. Congress knew how to craft exceptions to the ADEA, as there are several explicitly worded safe harbors in 29 U.S.C.S 623. Yet, aside from section 623(f)(2)(B)(i), there is no provision in the ADEA permitting an employer to treat retirees differently with respect to health benefits based on Medicare eligibility.[13]
 
 
 130
 We are not persuaded that the "reasonable factors other than age" defense is applicable. While it is possible that Congress intended Medicare eligibility to be a "reasonable factor other than age," we believe it is more likely that Congress would have drafted a specific provision addressing the issue rather than to rely on the courts to make a particular interpretation of the term "reasonable factors other than age." In reaching this conclusion, we point out that the legislative history we have cited demonstrates that when Congress passed the OWBPA it expressly considered the issue of availability of Medicare coverage. In addition, we note that the "reasonable factors other than age" defense has been held inapplicable to a policy which explicitly discriminates based on age. See EEOC v. Johnson & Higgins, Inc., 91 F.3d 1529, 1541 (2d Cir. 1996) ("[A]n employer has a defense if his policy is based on reasonable factors `other than age,' not if the policy is reasonably based on age. By its terms, the statute supplies an exception for `age-neutral' decisions based on other factors such as health or even education that might be correlated with age, not an exception for policies that explicitly but reasonably discriminate based on age.") (citation omitted). Here, the County has engaged in explicit age-based discrimination by using a proxy for age--Medicare eligibility --as a basis for differential treatment.
 
 
 131
 We believe that the appellants have put forth the proper interpretation of the statute, and thus we hold that the safe harbor set forth in 29 U.S.C. S 623(f)(2)(B)(i) is applicable in this case if the County can come within it. The plain language of section 623(f)(2)(B)(i) supports this conclusion by expressly adopting the statement of the equal benefit or equal cost principle as set out in 29 C.F.R. S 1625.10 (1989). As discussed, subsection (e) of that regulation expressly contemplates application of the equal benefit or equal cost standard in the Medicare eligibility situation. See 29 C.F.R. S 1625.10(e) (1989) ("[I]t is not necessary for an employer to provide health benefits which are otherwise provided to certain employees by Medicare. However, the availability of benefits from the Government will not justify a reduction in employer-provided benefits if the result is that, taking the employer-provided and Government- provided benefits together, an older employee is entitled to a lesser benefit of any type . . . than a similarly situated younger employee."). The Senate Report accompanying S. 1511 contemplated that section 1625.10(e) would apply to retirees. See S. Rep. No. 101-263, at 21-22 (1990), reprinted in 1990 U.S.C.C.A.N. 1509, 1527 ("The Committee intends to approve the . . . practice of integrating retiree health benefits with Medicare, which is already permitted under the regulation. See 29 C.F.R. 1625.10(e). The availability of Medicare benefits . . . will not justify a reduction in employer-provided retiree health benefits if the result is that, taking the employer-provided and government- provided benefits together, an older retiree is entitled to a lesser benefit of any type . . . than a similarly situated younger retiree."). Accordingly, the plain language of section 623(f)(2)(B)(i)--through its express reference to 29 C.F.R. S 1625.10--indicates that Congress intended section 623(f)(2)(B)(i) to apply when an employer reduces health benefits based on Medicare eligibility.
 
 
 132
 We acknowledge that our analysis is complicated by the presence of the term "older worker" in section 623(f)(2)(B)(i). As mentioned, the legislative history of the OWBPA reveals that Congress specifically chose the word "worker" over "individual" in this provision. See 136 Cong. Rec. S13, 599 (daily ed. Sept. 24, 1990) ("Summary of Pryor-Hatch- Metzenbaum-Heinz Agreement on Betts Legislation"). However, it is unclear why Congress made this change or what significance it was supposed to have. "Worker" is the term used in 29 C.F.R. S 1625.10(a)(1) in its description of the equal benefit or equal cost principle. Thus, Congress may have chosen this word merely because it wished to have congruity between the language of section 623(f)(2)(B)(i) and the language of the regulation. If that is the case, then Congress did not adopt the word "worker" with the specific intention of excluding retirees. In any event, the presence of the word "worker" is a rather thin reed upon which to base a conclusion that Congress intended to grant employers the unfettered right to reduce or eliminate health benefits for Medicare-eligible retirees if the employers maintain such benefits for other retirees. Again, if that was Congress' intent, presumably it would have adopted a specific provision to that effect.
 
 
 133
 We believe it makes good sense and furthers Congress' intent to apply the equal benefit or equal cost principle in this case. Section 623(f)(2)(B)(i) undoubtedly applies when an employer makes an age-based distinction in benefits for active employees. The equal benefit or equal cost standard similarly can be applied when an employer makes an age- based distinction in benefits for retirees. Further, the rule strikes a fair middle ground between the interests of the employer and the interests of older retirees. In order to take advantage of the safe harbor, an employer need not provide equal benefits to older and younger retirees, and it need not spend more on behalf of older retirees. It merely must spend equally. Thus, the rule avoids overburdening employers to such an extent that they will be tempted to throw up their hands and eliminate benefits for all retirees.[14] While some employers may choose that course, we believe far more will continue to provide retirement benefits in a manner which is lawful under the ADEA.
 
 
 134
 In sum, we hold that the safe harbor set forth in 29 U.S.C. S 623(f)(2)(B)(i) is applicable if the County can meet the equal benefit or equal cost standard. This matter therefore will be remanded to the district court for a determination as to whether the standard has been satisfied.
 
 3. Proper application of the standard
 
 135
 A few words on the proper application of the equal benefit or equal cost standard are warranted. In accordance with 29 C.F.R. S 1625.10(e), the "equal benefit" prong of the analysis should take into account equally both the Medicare-provided and the County-provided benefits which members of the plaintiff class receive. If the County cannot satisfy the "equal benefit" prong, the court should then turn to the "equal cost" inquiry. The County argues that, in applying the "equal cost" analysis, the court should consider the costs which Medicare incurs on behalf of persons in SecurityBlue as well as the costs which the County itself incurs. See appellee's br. at 57-59. We disagree. Clearly, the purpose of the equal benefit or equal cost standard is to encourage employers to spend equally on benefits for older and younger persons. See 136 Cong. Rec. S13,609 (daily ed. Sept. 24, 1990) (statement of Sen. Bentsen) ("[T]he [equal benefit or equal cost] rule does not require that an older worker receive the exact same level of a benefit that a younger worker receives, as long as the employer incurs the same cost in purchasing the benefit for the older worker as for the younger worker.") (emphasis added); 136 Cong. Rec. H8617 (daily ed. Oct. 2, 1990) ("Explanation of S. 1511" prepared by Rep. Clay) ("Under this approach [equal benefit or equal cost], an employer that provides a particular employee benefit must generally provide the same benefit to all workers. But if the cost to that employer of providing that benefit is greater for older workers than younger workers, the employer may provide a smaller benefit to older workers, so long as the employer spends at least the same amount of money for all workers.") (emphasis added). Accordingly, the district court should consider only those costs which the County itself incurs.[15]
 
 IV. CONCLUSION
 
 136
 In sum, we hold (1) that appellants have established a claim under 29 U.S.C. S 623(a)(1) because they have been treated differently in their "compensation, terms, conditions, or privileges of employment, because of . . . age" and (2) that the safe harbor provided under 29 U.S.C. S 623(f)(2)(B)(i) is applicable if the County can meet the equal benefit or equal cost standard. Consequently, we will reverse the order for partial summary judgment entered September 30, 1999, and will remand the matter to the district court for further proceedings consistent with this opinion, including giving the County the opportunity to establish its entitlement to a safe harbor under 29 U.S.C. S 623(f)(2(B)(i). In addition, the state law claims over which the district court declined to exercise jurisdiction shall be reinstated.[16]
 
 
 
 NOTES:
 
 
 *
 Honorable Milton I. Shadur, Senior Judge of the United States District Court for the Northern District of Illinois, sitting by designation.
 
 
 [1]
 SecurityBlue is "[a] Highmark Blue Cross Blue Shield Medicare HMO from Keystone Health Plan West." Highmark and Keystone are independent licensees of the Blue Cross and Blue Shield Association. App. at 130.
 
 
 [2]
 As indicated, Count I of the complaint asserted an ADEA claim against the County, while Count II asserted state law claims against both the County and the Board. The Board was not involved in the cross-motions for summary judgment, which related only to Count I.
 
 
 [3]
 The burden is on the employer to establish that its actions are lawful under the equal benefit or equal cost standard. See 29 U.S.C. S 623(f)(2).
 
 
 [4]
 The district court did not rule on the applicability of the "reasonable factors other than age" defense, but commented that "[i]n light of our conclusion that the Plaintiffs' eligibility for Medicare is an age-based factor, we would likely find this defense inapplicable as a matter of law." Erie County, 91 F. Supp.2d at 868 n.11.
 
 
 [5]
 The Department of Labor recognized the equal benefit or equal cost principle in a regulation issued in 1969. Effective July 1, 1979, enforcement authority over the ADEA was transferred from the Department of Labor to the EEOC. The EEOC continued the Labor Department regulations relating to section 4(f)(2) of the ADEA, which were recodified at 29 C.F.R. S 1625.10. See S. Rep. No. 101-263, at 8-12 (1990), reprinted in 1990 U.S.C.C.A.N. 1509, 1512-17.
 
 
 [6]
 On the floor of the Senate, Senators Hatch and Metzenbaum indicated that "coordination with government-provided benefits as specified by the EEOC guideline [29 C.F.R. S 1625.10] . .. would remain permissible" under the OWBPA. See 136 Cong. Rec. S13,808 (daily ed. Sept. 25, 1990) (statements of Sens. Hatch and Metzenbaum).
 
 
 [7]
 Senator Hatch proposed several amendments to S. 1511 which would have addressed the issue directly. Amendment No. 2695 would have inserted "[a]t the appropriate place" the following language: "Nothing herein shall be construed as requiring that Medicare-eligible retirees are entitled to the same benefits as non-Medicare eligible retirees." See 136 Cong. Rec. S13,443 (daily ed. Sept. 19, 1990). Amendment No. 2698 would have added a provision making it lawful for an employer "to observe the terms of a retiree health benefits plan which assumes that its eligible retirees have enrolled in Medicare, Part B and does not pay for benefits that would be paid under the Part B coverage, provided that the plan must provide for the payment of the eligible retirees' premiums for part B coverage." See 136 Cong. Rec. S13, 444 (daily ed. Sept. 19, 1990). Amendment No. 2704 would have inserted the following language into section 4(f) of the ADEA: "[N]othing in this bill shall be construed as requiring that Medicare-eligible retirees are entitled to the same benefits, after taking into account Medicare benefits, as non-Medicare eligible retirees." See 136 Cong. Rec. S13, 444 (daily ed. Sept. 19, 1990). The legislative history does not indicate why these amendments were not adopted.
 
 
 [8]
 According to the district court, "Congress's primary purpose in passing the OWBPA was to prohibit the type of employee benefit discrimination . . . which might discourage older workers from remaining in the workforce and/or punish older workers who remain actively employed." Erie County, 91 F. Supp.2d at 877. The district court may be correct in identifying this as the central aim of Congress, but we do not believe that the ADEA is limited to this purpose.
 
 
 [9]
 Appellants' theory is that the County has adopted a facially discriminatory policy with respect to retiree health coverage. We have commented as follows regarding facially discriminatory policies:
 We agree that when a policy facially discriminates on the basis of the protected trait, in certain circumstances it may constitute per se or explicit age discrimination. And, whether an employment practice involves disparate treatment through explicit facial discrimination does not depend on why the employer discriminates but rather on the explicit terms of the discrimination. This is because, in a facial disparate treatment case, the protected trait by definition plays a role in the decision-making process, inasmuch as the policy explicitly classifies people on that basis. Thus, when the policy itself displays the unlawful categorization, the employee is relieved from independently proving intent. DiBiase v. SmithKline Beecham Corp., 48 F.3d 719, 726 (3d Cir. 1995) (citations and internal quotation marks omitted).
 
 
 [10]
 During debates on the OWBPA, Representative Clay indicated that Medicare status is a proxy for age. See 136 Cong. Rec. H8617 (daily ed. Oct. 2, 1990) (statement of Rep. Clay) ("[E]mployers must be prohibited from providing older workers smaller benefits or no benefits solely because of their age or other proxies for age for example, pension or Medicare eligibility."); see also S. Rep. No. 101-263, at 23 (1990), reprinted in 1990 U.S.C.C.A.N. 1509, 1528 (indicating that, where "[p]ension-eligibility is a proxy for age . .. it is per se age discrimination to use pension-eligibility as a basis for denying an older worker any other benefit.").
 
 
 [11]
 The court did not address whether the State may have been entitled to the defense applicable where age is a "bonafide occupational qualification." See 29 U.S.C. S 623(f)(1). The State had waived that defense in the district court. See Johnson, 49 F.3d at 78 n.1.
 
 
 [12]
 As mentioned, a retiree must meet two conditions in order to be placed in SecurityBlue: (1) Medicare eligibility and (2) residence in the SecurityBlue service area. Erie County, 91 F. Supp.2d at 863, 867. Thus, there is a "but-for" causal relationship between Medicare eligibility (which is a proxy for age) and placement in SecurityBlue--"but for" having attained age 65, members of the plaintiff class would not have been placed in SecurityBlue. See Miller v. CIGNA Corp., 47 F.3d 586, 595-96 (3d Cir. 1995) (en banc) ("A plaintiff in an ADEA case . . . has the burden of persuading the trier of fact . . . that there is a `but-for' causal connection between the plaintiff 's age and the employer's adverse action --i.e., that age actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome of that process.") (citation and internal quotation marks omitted). Our conclusion is not affected by the fact that a person under 65 can qualify for Medicare based on disability as the members of the plaintiff class became Medicare-eligible based solely on age. See appellants' br. at 36.
 Our conclusion might be different if the County placed in SecurityBlue only those retirees who actually chose to enroll in Medicare Part B. In that event, the determinative factor in the allegedly disparate treatment arguably would not be age but rather each individual's choice to enroll in Medicare Part B--that is, placement in SecurityBlue would not follow ineluctably upon attaining age 65. Here, however, the County chose to place in SecurityBlue all retirees residing in the SecurityBlue service area who reached Medicare age. See appellants' br. at 35. Accordingly, we must conclude that the members of the plaintiff class were placed in Security Blue "because of . . . age."
 
 
 [13]
 The Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"), Pub. L. No. 97-248, 96 Stat. 324, 353 (1982), added a new subsection (g) to section 4 of the ADEA, providing as follows: "[A]ny employer must provide that any employee aged 65 through 69 shall be entitled to coverage under any group health plan offered to such employees [sic] under the same conditions as any employee under age 65." TEFRA S 116(a). The EEOC interpreted section 4(g) as applying to active employees and not retirees. See 48 Fed. Reg. 26, 435 (1983). Section 4(g) was repealed in 1989. See Pub. L. No. 101-239, 103 Stat. 2106, 2233. A similar provision is now present in the Medicare Act. See 42 U.S.C. S 1395y(b)(1)(A). That provision is limited to those who have "current employment status with an employer." Id. We do not believe that the former section 4(g) of the ADEA or the EEOC's interpretation thereof has any bearing on this case, as that provision is no longer part of the statute. Nor does 42 U.S.C. S 1395y(b)(1)(A) have any relevance, as that provision is expressly limited to active employees.
 We also note that section 103(3) of the OWBPA addressed the subject of retiree health benefits by establishing a safe harbor permitting an employer to deduct the value of retiree health benefits and pension "sweeteners" from severance pay in the event of a "contingent event unrelated to age." See 29 U.S.C. S 623(l)(2). In order to make the deduction under this provision, the "package" of retiree health benefits for those "below age 65" must be "at least comparable to benefits provided under title XVIII of the Social Security Act," and the "package" of benefits for those "age 65 and above" must be "at least comparable to that offered under a plan that provides a benefit package with one-fourth the value of benefits provided under title XVIII of such Act." See 29 U.S.C. S 623(l)(2)(D). In addition, the provision discusses how the value of retiree health benefits is to be calculated, depending on whether the employer's obligation to provide the benefits is of "limited duration" or "unlimited duration." See 29 U.S.C. S 623(l)(2)(E). Clearly, section 623(l)(2) contemplates that an employer might reduce retiree health benefits at age 65. However, this provision expressly states that its description of retiree health benefits is "[f]or purposes of this paragraph and solely in order to make the deduction authorized under this paragraph." See 29 U.S.C. S 623(l)(2)(D). This statement indicates that Congress did not intend this provision to affect the interpretation of other portions of the ADEA. See 136 Cong. Rec. H8628 (daily ed. Oct. 2, 1990) (statement of Rep. Clay); 136 Cong. Rec. S15,399 (daily ed. Oct. 16, 1990) (statement of Sen. Hatch). Accordingly, this provision does not affect our analysis.
 
 
 [14]
 We obviously do not decide whether an employer acts lawfully in treating retirees differently than active employees with respect to the provision of benefits for, as we noted above, appellants have abandoned their claim based on this distinction. We do note, however, that it would seem difficult to contend that such a distinction would be based on any "individual's age," see 29 U.S.C. S 623(a)(1), as it would be predicated instead on the individual's employment status.
 
 
 [15]
 We recognize that our conclusion on the effect of Medicare expenditures may eliminate the possibility of an employer satisfying the equal cost safe harbor in situations in which classes of individuals are divided depending upon the presence of Medicare eligibility. We acknowledge this possibility because it seems logical to believe that employers whose retirees have Medicare coverage will be able to shift a large portion of the cost of health care coverage to Medicare. The record, however, does not include information on this point. Nevertheless, even assuming that the equal cost safe harbor never will be available in Medicare situations, we are satisfied that we have reached the correct result with respect to the effect of Medicare expenditures.
 
 
 [16]
 In reaching our conclusions, we are in substantial agreement with the position taken by the EEOC as amicus. The EEOC takes no position as to whether the equal benefit or equal cost standard is satisfied in this case. See EEOC's br. at 12 n.4.
 
 
 SHADUR, Senior District Judge, dissenting:
 
 137
 This dissent is triggered by the most fundamental of considerations: the lack of a final order below, creating a lack of jurisdiction over this appeal. Because the litigants themselves had not perceived that as an issue in their respective briefs, our panel called the matter to their attention sua sponte (the appropriate handling whenever jurisdiction is in question). And as the majority opinion reflects at page 13, appellants' letter response left no doubt that we were indeed not dealing with a full deck:
 
 
 138
 Appellants do not and need not withdraw their state law claim in Count 2 of the complaint.
 
 
 139
 What we have then is a situation in which, by the express choice of appellants-plaintiffs acting through their counsel, their Count 2 claim under state law--a claim that comes to the federal courts under the auspices of the supplemental jurisdiction conferred by 28 U.S.C. S 1367(a)-- remains fully viable. And that being so, the district court's substantive decision as to appellants' Count 1 ADEA claim --a decision that is the only subject of the present appeal-- unquestionably "adjudicated fewer than all of the claims" (in the words of Fed. R. Civ. P. ("Rule") 54(b)).
 
 
 140
 In that circumstance Rule 54(b) could not be more clear: As a matter of law, the district court decision did "not terminate the action as to any of the claims..." (emphasis added). And that of course means that in the same plain language, the district court's ruling on the federal ADEA claim did not terminate that claim either. With the exception of some outliers, the strong trend in the case law everywhere is to recognize, as Rule 54(b) teaches, that an attempted appeal from such a partially dispositive order (absent an express Rule 54(b) determination and direction by the district court, which was neither sought nor granted here) is invalid because the order below was not a final judgment.
 
 
 141
 Authorities so holding are so numerous as scarcely to require citation, but see, e.g., the thoughtful opinions from my own home circuit in West v. Macht, 197 F.3d 1185, 1188-90 (7th Cir. 1999); JTC Petroleum Co. v. Piasa Motor Fuels, Inc., 190 F.3d 775, 776 (7th Cir. 1999); and the circuit's more extended treatment in Horwitz v. Alloy Automotive Co., 957 F.2d 1431 (7th Cir. 1992). More generally, the subject has been addressed at length--and by reaching the same conclusion of no final order, hence no appellate jurisdiction--by Professor Rebecca Cochran in Gaining Appellate Review by "Manufacturing" a Final Judgment Through Voluntary Dismissal of Peripheral Claims, 48 Mercer L.Rev. 979 (1997)(see especially id. at 1005-06).
 
 
 142
 But most significantly for present purposes, this Court has itself addressed the same problem and has expressly held that no appellate jurisdiction existed where (as in this case) plaintiffs had reserved the opportunity to revive the nonappealed claims that had been dismissed without prejudice. That was both the square holding and the language of Tiernan v. Devoe, 923 F.2d 1024, 1031 (3d Cir. 1991)(emphasis added, and citing the earlier decisions in Fassett v. Delta Kappa Epsilon (New York), 807 F.2d 1150 (3d Cir. 1986) and Ingersoll-Rand Fin. Corp. v. Callison, 844 F.2d 133, 135 n.1 (3d Cir. 1988)):
 
 
 143
 As a preliminary matter we must establish whether we have appellate jurisdiction. This is an appeal from the district court's enforcement of settlement agreements purportedly entered into between plaintiffs and three out of four groups of defendants. Before this appeal was filed the claims against the remaining defendant group, the Devoe Defendants, were dismissed; but this dismissal was, for some of the plaintiffs, without prejudice. Some plaintiffs retained the ability to reinstitute part of this litigation. Thus, at the time this appeal was filed, jurisdiction under 28 U.S.C. S 1291 was lacking.
 
 
 144
 That defect has since been cured. Several months after this appeal was filed, plaintiffs renounced, through letter briefs, any intention to take further action against the Devoe Defendants. Therefore, we now have jurisdiction over this appeal.
 
 
 145
 And Fassett (which was followed in Ingersoll-Rand) plainly stands for the same proposition, for there the panel opinion upheld appealability only because the plaintiff had both "voluntarily and finally abandoned" the claims that were dismissed "nominally without prejudice," thus making the dismissal "for our purposes a final dismissal" (Fassett, 807 F.2d at 1155 (emphasis added in each instance)).[1]
 
 
 146
 As against those direct holdings in this Circuit and the like wealth of authority elsewhere, the majority opinion cites only to Nyhuis v. Reno, 204 F.3d 65, 68 n.2 (3d Cir. 2000) and Bhatla v. U.S. Capital Corp., 990 F.2d 780, 786 (3d Cir. 1993). But Nyhuis dealt with a situation much different from the multiple claim situation that we have here--and by sharp contrast, the deliberate choice that has been made by appellants' counsel as to Count 2 in this case scotches the very notion that the "without prejudice" description was "anomalous," as the panel found to be the case in Nyhuis, 204 F.3d at 68 n.2. Indeed, I submit that a full reading of the cited footnote supports the conclusion reached here, not that reached in the majority opinion. As for Bhatla, I suggest that a reading of that opinion makes it surprising to see the decision cited in support of, rather than in opposition to, the majority's stance.[2]
 
 
 147
 Nor does even one of the parade of citations that follow in the majority opinion add a whit to the analysis.[3] Without exception, each of those cases (even as disclosed by the majority's summary of their holdings) deals with the totally different situation in which the court made the ultimate decision to dispatch all of the claims in the action--for example, by the remand of a case in its entirety to the state court or by a without-prejudice dismissal or remand to the state court of unresolved claims under the authority of 28 U.S.C. S1367(a)(3) or under the long-standing doctrine of United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966).[4]
 
 
 148
 Again the contrast with the present situation is clear: Here the litigant--given the opportunity to clean up its act in jurisdictional terms--chose to relinquish its other federal claim with prejudice but also expressly chose to preserve its state law claim, so that the district court's substantive resolution of the federal claim had "adjudicate[d] fewer than all the claims" (again to quote Rule 54(b)). It is thus surprising to find the majority opinion in part calling to its aid the decision in Trent v. Dial Med. of Florida, Inc., 33 F.3d 217, 220 (3d Cir. 1994), for the language quoted by the majority tellingly stops short of the opinion's statement that directly pointed to the square holding in Tiernan that makes the very distinction that controls here (emphasis added):
 
 
 149
 Even dismissals without prejudice have been held to be final and appealable if they "end[ ][the] suit so far as the District Court was concerned," although we have indicated that such dismissals may not constitute final orders until the party seeking relief renounces any intention to reinstate litigation. See Tiernan v. Devoe, 923 F.2d 1024, 1031 (3d Cir. 1991).
 
 
 150
 In sum, it is truly a non sequitur for the majority to conclude (in its opinion at 13) that "we have jurisdiction under 28 U.S.C. S 1291" by reason of the appellants' with- prejudice withdrawal of "any ADEA claim not disposed of by the district court's September 30, 1999 order," while at the same time appellants' selfsame letter has reconfirmed the nonwithdrawal of their Count 2 state law claim. Just the opposite is true. And to support that opposite conclusion, we have square precedents from this Circuit as well as elsewhere, as against the total absence of even a single Third Circuit case that deals with the present situation and nevertheless upholds appellate jurisdiction.
 
 
 151
 With respect, it seems to me that the majority opinion's treatment of this vital issue, running counter as it does to the only Third Circuit decisions that deal directly with the subject, also runs counter to the notion that no panel is free to depart from prior circuit law. But that aside, nothing in the majority opinion appears to respond to the heavy weight of authority that teaches the lack of finality, and therefore of appellate jurisdiction, under the circumstances presented here.
 
 
 152
 I respectfully dissent.
 
 
 
 NOTES:
 
 
 [1]
 Judge Adams' dissent in Fassett, id. at 1166-67 would not have granted finality even to a without-prejudice dismissal of a claim on which the statute of limitations had run.
 
 
 [2]
 Bhatla's holding of nonfinality, and hence of nonappealability and the lack of appellate jurisdiction, rests directly on the appellants' retained freedom to pursue the claims that they dismissed without prejudice (directly paralleling the situation here).
 
 
 [3]
 Indeed, the first of the cases cited to exemplify the insupportable "we have always done it this way" premise--Reitz v. County of Bucks, 125 F.3d 139, 143, 148 (3d Cir. 1997)--says not a word on the subject of jurisdiction or its absence. Just as Socrates is quoted in Plato's Apology as teaching that "the unexamined life is not worth living," just so the unexamined decision is not worth citing. And in jurisprudential rather than philosophical terms, no less an authority than the Supreme Court has consistently taught that no weight is to be attached to such an unexamined holding--a principle that dates back to Chief Justice Marshall (United States v. More, 7 U.S. (3 Cranch) 159, 172 (1805), that has survived the two intervening centuries (see, e.g., United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 38 & n.9 (1952), and that is still alive and well and living in Washington (see, e.g., Lopez v. Monterey County, 525 U.S. 266, 281 (1999), reconfirming the comparable holding in Brecht v. Abrahamson, 507 U.S. 619, 630-31 (1993)).
 
 
 [4]
 In such a situation the Court of Appeals, if it reverses a district court's substantive decision that dismissed any claims that had been resolved at that initial level, may itself choose to reinvigorate other claims that had been dismissed without prejudice (see 28 U.S.C. S 2106, which empowers a reviewing court's remand order to "direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances"). That of course contrasts with any notion of a comparable power of self-determination on a litigant's part.